**ALLEN & COMPANY, Plaintiff,**

v.

**OCCIDENTAL PETROLEUM CORPO-
RATION, Defendant.**

**No. 67 Civil 4011.**

United States District Court,
S. D. New York.

Aug. 30, 1974.

------

Eaton, Van Winkle & Greenspoon, New York City, for plaintiff; John Van Voorhis, Samuel N. Greenspoon, Daniel A. Pollack, Paul Z. Lewis, New York City, of counsel.

Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for defendant; Louis Nizer, Neil A. Pollio, George Berger, New York City, Mitchell, Silberberg & Knupp, Arthur Groman, Los Angeles, Cal., of counsel.

OPINION

EDWARD WEINFELD, District Judge.

Plaintiff is a limited partnership which is and has been engaged in the business of investment banking; its managing partners are Charles Allen, Jr. and Herbert Allen, Sr., brothers. The defendant is a corporation engaged in promoting various projects including the acquisition and exploitation of oil concessions; its principal executive officer is Dr. Armand Hammer.

Plaintiff seeks to recover in excess of one hundred million dollars upon a claim of breach of a joint venture with defendant to acquire and exploit oil concessions in the Kingdom of Libya, or for an accounting of profits. The defendant denies the existence of a valid and enforceable agreement, contending that the arrangement of the parties was an agreement to agree in the future which never ripened into a binding arrangement and that if an agreement was in effect, a material term was not performed; in addition, it sets up various defenses, including termination of the alleged agreement by consent and acquiescence, laches, and estoppel.

The litigation has been somewhat protracted from its start. The pretrial proceedings, including the oral depositions of the parties and witnesses, interrogatories and answers thereto, documents produced under discovery, requests for admissions and other pretrial activities produced in advance of trial a record of thousands of pages. The trial itself took twenty-one trial days, with a transcript of testimony totaling over 3,000 pages [1] and with several hundred exhibits in evidence. Since the trial was to the court, some testimony and a number of exhibits, which upon their face include hearsay matter and self-serving declarations, were received with the observation that the court's determination of the issues would be uninfluenced

------

[1]. Referred to hereafter as Trial Record, T.R.

thereby and that only proper evidence would be considered.[2]

■ Despite the very voluminous record, the issues to be decided are comparatively simple—at least so they appear to this court—although the parties relentlessly pursued many matters which are of minimal consequence to what the court finds are the three basic issues: [3] (1) was there a valid and enforceable contract of joint venture between the parties; (2) if so, did Ferdinand Galic,[4] as the amended complaint alleges, "turn up" the concessions granted by the Libyan government to the defendant, which are the subject of plaintiff's claim; and (3) assuming a valid agreement, was it terminated with plaintiff's consent and acquiescence. As to the first two, the plaintiff has the burden of proof;[5] as to the third, the burden of persuasion is upon the defendant. Thus, even if plaintiff establishes the existence of an agreement as alleged, in the event it was terminated with plaintiff's acquiescence there would be no basis for recovery. So, too, if the defendant sustains its defense of estoppel or laches plaintiff would be barred from a recovery.

## THE ALLEGED AGREEMENT OF JOINT VENTURE

Early in 1964, in Paris, France, a "General" deRovin advised one Ferdinand Galic that he had powerful contacts in Libya to obtain oil concessions there. Galic, a long-time friend of the Allens, conveyed this information to them and portrayed deRovin as a man of great influence in Libya. Herbert Allen in turn communicated with Dr. Armand Hammer, advising they had a friend, Galic, who, with associates, could deliver oil concessions in Libya where Occidental was interested in acquiring concessions, having previously submitted proposals therefor. Thereafter, in September 1964, at London, England, Herbert Allen, Sr., Armand Hammer, "General" deRovin, Ferdinand Galic and one Taher Ogbi, a Libyan who also was represented to be influential in Libyan affairs, met at different meetings over a 2-day period. The result was twofold: (1) the defendant confirmed in writing on September 18, 1964 separate arrangements it had made with Galic, "General" deRovin and Ogbi to render services relating to Occidental obtaining oil concessions in Libya; (2) Herbert Allen, Sr. and Hammer had discussions upon which plaintiff bases its claim that an agreement was reached to form a joint venture to acquire and exploit oil concessions in the Kingdom of Libya. No writing was then signed; plaintiff alleges the agreement was sealed by a handshake between Allen and Hammer; that its terms provided, as the amended complaint alleges, the parties would share all concessions "turned up" by Galic on the basis of a 25% interest to plaintiff and 75% interest to defendant with profits and costs to be shared in the same proportion. The defendant denies that such an agreement was reached. The complaint further alleges that on December 17, 1964 a memoran-

2. Reid v. Quebec Paper Sales & Transportation Co., 340 F.2d 34, 38 (2d Cir. 1965); United States v. 396 Corp., 264 F.2d 704, 709 (2d Cir.), cert. denied, 361 U.S. 817, 80 S.Ct. 60, 4 L.Ed.2d 64 (1959); United States v. 1,291.83 Acres of Land, 411 F.2d 1081, 1086 (6th Cir. 1969); New York Life Ins. Co. v. Harrington, 299 F.2d 803, 806 (9th Cir. 1962); Commonwealth Edison Co. v. Allis-Chalmers Co., 40 F.R.D. 96, 101 (N.D.Ill.1966); 9 C. Wright & A. Miller, Federal Practice and Procedure § 2412 (1971). See also T.R. pp. 92; 427; 465; 2973; 2978.

3. E. g., T.R. 422; 456; 2808; 2978; also PASSIM.

4. In various documents in evidence, Galic's name is spelled "Galic" and "Gallic." However, by the time of trial, the parties appear to have settled on the form of spelling which appears throughout this opinion.

5. See Bowen v. Horgan, 259 N.Y. 267, 269, 181 N.E. 567 (1932); Uni-Serv Corp. v. Frede, 53 Misc.2d 644, 279 N.Y.S.2d 510 (App.T.1967); Ruane v. Smith, 5 Misc.2d 366, 159 N.Y.S.2d 859, 861 (Sup.Ct.1957); Modica v. Battista, 72 Misc.2d 763, 339 N.Y.S.2d 599, 602 (Dist.Ct.1972).

dum was signed in relation to their agreement. This refers to a letter bearing that date sent by Hammer to Herbert Allen which states in part:

"Confirming our recent conversation regarding possible concessions in Libya, we agree to the same arrangements with you on the possible second concessions as on the first concessions, namely, Occidental will share on the basis of 75% for us and 25% for you on anything Ferdinand Gallic turns up. This includes sharing costs and profits."

Herbert Allen, after consultation with an attorney for plaintiff, made a handwritten change in the above letter by the insertion of the phrase "to be mutually agreed upon" following the words "costs." Allen then initialed and returned it to Hammer with a letter dated December 24, 1964, wherein he stated:

"I am returning herewith your letter of December 17th in duplicate with just one major change and that is, that the cost should be 'to be mutually agreed upon', and I have initialed same.

\* \* \* "

The change made by Herbert Allen was accepted, and initialed by Hammer who returned the letter to plaintiff on December 28, 1964.

The foregoing recital of facts is not in dispute; also, it is not disputed that the "first concessions" referred to in the letter of December 17 are the two concessions bid for and eventually granted to defendant that are the subject of this lawsuit. Plaintiff contends that the December 17 letter with its handwritten insertion of the words "to be mutually agreed upon" merely memorialized certain provisions of the September 16, 1964 agreement concluded at London, England. In summary, it is contended that Herbert Allen for plaintiff and Ar-

mand Hammer for defendant then and there orally entered into an agreement for the acquisition and development of oil concessions in Libya, the specific terms of which were: (1) the plaintiff and defendant were co-venturers with respect to areas numbered 32 and 59,[6] on the basis of a 25% interest to plaintiff and a 75% interest to defendant; (2) plaintiff would contribute, upon being billed by defendant, 25% of the costs thereof and defendant would contribute 75% of such costs; (3) profits and losses would be shared 25% by plaintiff and 75% by defendant; (4) defendant would manage the venture and handle all necessary details and would bill plaintiff for its share of the costs; and (5) that either in September 1964 or sometime afterwards but prior to December 17, 1964 the foregoing agreement was amended so as to provide that the costs should be mutually authorized.[7]

Defendant, on the other hand, denies that a joint venture agreement was reached in London or thereafter or that the parties even discussed at London that defendant would be managing partner of such a venture. Hammer's version is that Allen stated that Allen & Company wanted to participate to the extent of 25%, which was acceptable to him provided the concessions were obtained by Galic; further, that Allen & Company would make an investment proportionate to its percentage, but Allen said his firm was not ready to make a heavy risk investment unless the amount was mutually agreed upon in advance; that Allen "wanted freedom of action of deciding if they wanted to put up their money or if they didn't want to put up their money at any stage," [8] which also was agreeable to Hammer. The defendant further contends, and in support of his position points to Charles Allen's testimony at the trial,[9] that the Decem-

6. Defendant was awarded the concessions for Blocks 42B and 44 which were carved out of Released Area 59 which had been mentioned at the London meetings.

7. Plaintiff's Proposed Findings 32, 33.

8. T.R. 804–05.

9. A position disavowed by his own counsel. *See* "Plaintiff's Contentions as to the Contract Between the Parties" pp. 7–8.

ber 17 letter contains their total arrangements regarding the Libyan oil concessions. The defendant's further position is that even accepting plaintiff's contention that an agreement was reached in September, later memorialized in December 1964, that it simply reflected an agreement to agree in the future since the costs of the project, a vital term, remained subject to mutual agreement.

■ It may readily be acknowledged that New York law [10] on the issue is not sharply defined so that there may be certitude of judgment. It is clear, however, that the court's inquiry does not "come[s] to a full stop as soon as the phrase '[to be] mutually agreed upon' is encountered." [11] This court is of the view that the New York courts would find the answers to two questions decisive as to whether the parties here entered into an enforceable contract: (1) Did the parties intend to enter into a binding contractual relationship, even though a material term was "to be mutually agreed upon" in the future, or did the parties intend the "contract" to be binding only if they did thereafter in fact arrive at a mutually satisfactory agreement as to the term? [12] If the answer to the first part of the question is no and the second part yes, the agreement is incomplete and unenforceable; if the answers are the reverse, there may be an enforceable contract depending on the answer to the second or following question. (2) Assuming the parties intended to enter into a binding contractual relationship, are there sufficiently objective criteria whereby a

court can determine—in effect, fill in—the blank or open terms? [13] Here, the questions are close and the cases cited by the respective parties offer no solution; the instant case must be decided upon its own facts.

■ Turning to the first question, it is apparent, if the parties reached an understanding, whether in September or December 1964, that an item of importance was left open and subject to future mutual agreement—the costs to be incurred in pursuit of the venture. These could include the preliminary expenses for the acquisition of the concessions, and once acquired, the additional expenses of their exploitation. Passing for the moment the cost of the acquisition, the expense of exploitation could run into the many millions of dollars and end up as a "dry hole"—a complete loss of capital, one of substance and consequence, even to those of great wealth. In fact, as the parties knew, two leading American oil companies each had expended fifty million dollars exploring concessions in Libya without getting a single barrel of oil; a French oil company had a similar experience to the extent of twenty-five million dollars. The Allens acknowledged they were aware that hundreds of millions could be sunk into the ground in a vain search for oil. Thus, substance is given to Hammer's testimony that Herbert Allen, both in his discussion at the London meeting in September 1964 and again in December 1964 by his handwritten insertion of the phrase "to be mutually agreed upon," described by Allen himself as a "major change," was the cautious financial

10. The parties agree that since jurisdiction is based upon diversity of citizenship, the substantive law of New York applies.

11. *May Metropolitan Corp. v. May Oil Burner Corp.*, 290 N.Y. 260, 265, 49 N.E.2d 13, 15 (1943).

12. *See* May Metropolitan Corp. v. May Oil Burner Corp., 290 N.Y. 260, 264, 49 N.E.2d 13 (1943); Mayer v. McCreery, 119 N.Y. 434, 23 N.E. 1045 (1890); Park Inn Hotel, Inc. v. Messing, 31 Misc.2d 961, 224 N.Y.S. 2d 179 (Sup.Ct.1962). *See also* Ansorge v.

Kane, 244 N.Y. 395, 155 N.E. 683 (1927); St. Regis Paper Co. v. Hubbs & Hastings Paper Co., 235 N.Y. 30, 36, 138 N.E. 495 (1923).

13. *See* May Metropolitan Corp. v. May Oil Burner Corp., 290 N.Y. 260, 265–266, 49 N. E.2d 13 (1943); Metro-Goldwyn-Mayer, Inc. v. Scheider, 75 Misc.2d 418, 347 N.Y.S.2d 755, 761 (1972), modified on other grounds, 43 A.D.2d 922, 352 N.Y.S.2d 205 (1974); *cf.* N.Y.U.C.C. §§ 2–204(3), 2–305(1)(b) (McKinney 1964).

investor who sought to protect plaintiff against the risk of extremely heavy commitments with respect to the Libyan oil concessions without its prior approval and consent. I accept Hammer's testimony that at the London meeting, the discussions relative to a 25% participation by Allen & Company reflected plaintiff's purpose to have "the freedom of action of deciding if they wanted to put up their money or didn't want to put up their money at any stage" [14]—that plaintiff sought and obtained such "freedom of action," thereby leaving open for future agreement an essential term of the proposed relationship.

With "costs to be mutually agreed upon," was the defendant free to make vast expenditures of risk capital and was plaintiff to pay 25% upon being billed, or were the expenditures subject to plaintiff's prior agreement or veto? Whether conceived by Herbert Allen alone or with the advice of his counsel, the court is convinced that, upon the facts of this case, the phrase "to be mutually agreed upon" was intended by plaintiff as an escape clause whereby it would not be bound to the proposed venture unless and until it approved any costs incurred. The evidence supports a finding that the parties did not intend to enter into a binding contractual relationship absent mutual agreement upon the costs for the acquisition and exploitation of the project.

■ Second, even assuming that the parties intended to be bound by their arrangement, costs, an essential term thereof, upon which the parties never reached an agreement, is so indefinite that the contract is unenforceable. If the parties failed to "mutually agree" on costs to be charged against the venture, upon what basis could a court fill in that essential term?

What is the standard of reasonable costs or investment for the project which plaintiff claims was the subject of the joint venture agreement? Plaintiff argues that it "could no more have abandoned defendant, without paying its 25% share of the costs which were reasonably appropriate to the exploitation of the venture, than defendant could have exclude[d] plaintiff from the venture. . . ." [15] This rhetorical position must yield to the realities of the situation as the parties created them. Assume defendant had expended twenty million dollars for exploitation and billed plaintiff for its 25% share, but plaintiff refused to pay because the funds had been expended without its approval. Who decides, and upon what criteria, whether twenty million dollars was, to use plaintiff's language, "reasonably appropriate to the exploitation of the venture"? And if after the expenditure of that substantial sum oil was nowhere in sight, was defendant thereafter free to probe further in the hope of striking oil and to incur additional substantial expenses with plaintiff committed to pay its 25%? This is not a situation where prior demonstrated experience in an industry can be drawn upon in deciding what costs are reasonable and may be reasonably incurred, despite initial failure in carrying out or exploiting the purpose of a joint venture, as was the case in Lord v. Pathe News, Inc.,[16] so heavily relied upon by plaintiff.

The exploitation of concessions involves astronomical costs which vary from project to project; unusual risk capital is required. Indeed, plaintiff's lawyer, who counseled it on the inserted clause, referred to the concessions as "at most a hunting license, maybe only just a lottery ticket." [17] It has not been suggested, and certainly no proof has been offered, that such amounts can be determined by industry practice, custom or usage of the trade.

14. T.R. pp. 804–05.

15. Plaintiff's Post Trial Brief, p. 21.

16. 97 F.2d 508 (2d Cir. 1938).

17. T.R. 2431.

Moreover, standards for determining what costs would be proper and reasonable in "turning up" the concessions are even less tangible. If the Galic group submitted a one million dollar expense bill for "turning up" concessions and one party refused to pay the agreed upon percentage of the sum, on what basis would a court determine what items on the bill were properly chargeable against the joint venture? What exactly does "turning up" an oil concession entail? Does it include hotel bills, entertainment expenses or gifts? Plaintiff has offered no evidence that would begin to answer these questions.

The indefiniteness of the agreement is further emphasized by the testimony of plaintiff's counsel, who, upon consultation by Herbert Allen, either authorized or approved the phrase "to be mutually agreed upon." He testified that he understood the phrase to apply differently to the two phases of the proposed joint venture [18]—as to the acquisition of the concessions, consent of the plaintiff to costs was required; however, once acquired, the defendant had absolute discretion to expend whatever sums it deemed necessary in exploiting the concessions.[19] This testimony serves to underscore that the agreement alleged by plaintiff, the enforceability of which plaintiff has the burden of proving, is indefinite, incomplete and abounds in too many uncertainties as to what the parties agreed upon. The court finds that the parties did not enter into or reach a binding agreement; further that they left open vital matters as to costs for future agreement, as to which there are lacking definite objective criteria.

## TERMINATION OF THE AGREEMENT

Assuming, contrary to the foregoing conclusion, that there was a valid joint venture agreement, as plaintiff contends, there remain the issues of whether the concessions were in fact "turned up" by Galic, and whether the agreement was terminated with plaintiff's consent or acquiescence. Since plaintiff, somewhat contrary to its pretrial and trial position,[20] now contends that its claimed agreement with defendant was effective immediately when, in the summer of 1964, Galic brought to the parties' attention the opportunity to obtain oil concessions, and it was not premised on further activity by Galic provided the concessions were granted, we defer consideration of Galic's performance and turn to the issue of termination.

■■ The Galic-deRovin-Ogbi group may be considered a unit of which Galic was the leader. Each was engaged under agreements dated September 18, 1964 upon representations that he was influential with various Libyan officials who had roles in the granting of oil concessions in Libya. Galic purportedly was particularly persuasive with and had the ear of Fuad Kabazi, the Libyan Minister of Petroleum Affairs from March 1964 until April 1967. After desultory activities by the Galic group, which were of no consequence in obtaining the concessions, information was received in March 1965 by a French banking concern in which plaintiff had a financial interest that deRovin was an imposter with an extensive criminal record, which information plaintiff forwarded to the defendant. By this time, the defendant, on the basis of the Galic

18. T.R. 2512; 2530–2531.

19. It is not without interest that plaintiff disavows this portion of its attorney's testimony "since he was [not] a party to the agreement [nor] did [he] negotiate the words actually used, and was not the author of the words." Plaintiff's Post Trial Reply Brief, p. 41. The evidence however, does warrant the finding that the attorney was either the author of or approved the phrase, although he was vague as to whether he formulated the exact language. While the testimony of the attorney on this point does not, of course, bind the court as to the legal import of the language, it emphasizes the uncertainty which surrounds the use of the phrase.

20. T.R. 464; 2460–63; 2536; 2806.

group's actions or non-actions, was of the view that its purported power to aid in obtaining concessions was greatly exaggerated, if not false. Thus, the intelligence about deRovin's background persuaded the defendant that any activity by the Galic group on its behalf would be detrimental rather than helpful in its efforts to obtain concessions; moreover, it concluded that the Galic group's status in Libya had been misrepresented, as well as its ability to advance procurement of the concessions by personal negotiations. Also, in violation of their agreements, it appeared that deRovin had assigned a portion of his compensation to Galic, and Ogbi had assigned 10% of his commission to deRovin, who conveyed half of that 10% to Galic. Accordingly, the defendant decided to terminate its relationship with the Galic group. Under all the circumstances, the defendant was justified in its course of action. The defendant, however, was apprehensive— and with reason—that a forthwith termination would cause the Galic group to try to undermine its efforts to obtain the concessions. To protect itself against hostile action by the Galic group, the defendant enlisted the services of others deemed reliable and secured from Chase Manhattan Bank a statement of defendant's financial responsibility, which later was submitted with its competitive bid for the concessions. Thereupon, on July 16, 1965, defendant, by cable, notified Galic and deRovin that it would not utilize their services in acquiring Libyan oil concessions and released each of any obligation under the September 1964 agreements signed at London.[21] On the same day the defendant advised plaintiff of its action, by letter, (hereafter the Termination Letter) as follows:

"With reference to our agreement of December 17, 1964, I have sent the enclosed cables to Mr. Ferdinand Gallic and General de Rovin.

"Our agreement of September 18, 1964, with Ogbi Brothers was cancelled on June 19, 1965, when I met Mr. Taher Ogbi in London together with Mr. Gallic.

"In light of your letter to me of March 16, 1965, enclosing the report on General de Rovin, any association that we would have with him would prejudice any possibility we would have of getting any concessions in Libya and I made this perfectly clear to Mr. Galic.

"In light of the above, our agreement of December 17, 1964, releases us from any commitment toward Allen & Company. You are likewise free to make any other arrangements you wish."

Plaintiff did not respond in writing to this letter. Its first written communication on the subject was some eighteen months later, January 31, 1967, when plaintiff inquired as to the status of the oil concessions under circumstances hereafter referred to. The defendant contends that the plaintiff, by its course of conduct during the intervening period, acquiesced in or consented to the termination of the agreement. The plaintiff, on the other hand, contends that Occidental conceived a plan and scheme to exclude it and Galic from the enterprise and to prevent Galic from turning up the concessions as provided for in the claimed joint venture agreement, and concealed its scheme until shortly before July 29, 1965, the last day on which applications for concessions could be filed.

Plaintiff explains that its failure to answer the defendant's termination letter was due to its counsel's advice that the letter was "meaningless" and hence required no answer. Additionally, it contends that several times after its re-

---

21. Defendant had previously cancelled its agreement with Ogbi, with Ogbi's consent, in June 1965. Ogbi did remain, however, plaintiff's "agent and attorney-in-fact" in Libya, which he was designated in defendant's application for concessions. This is a ministerial position required by Libyan law and it does not appear Ogbi played a substantial role in the award of the concessions to the defendant.

ceipt the Allens told Hammer of their counsel's advice, mentioned their continued participating interest in the Libyan concessions and that on those occasions Hammer orally acknowledged the joint venture agreement was still in effect. Hammer denies these incidents and plaintiff's charges. The defendant emphasizes that not only did plaintiff not protest the termination in writing or otherwise and remained silent for more than eighteen months, but both Allens agreed that defendant was justified in terminating Galic and acknowledged that a claim Galic had made against defendant under the September 18, 1964 agreement was unfounded.

Upon the entire record I find that the defendant by substantial evidence has fully sustained its defense that, if there were an enforceable agreement, it was terminated with plaintiff's consent and acquiescence. It strains credulity to the breaking point to believe that if the Allens, experienced investment bankers, believed they had a 25% interest in a joint venture for the exploration of oil with a potential "of hundreds of millions of dollars of profit in the deal,"[22] they would not, upon receiving a written notice wrongfully terminating the arrangement, have protested or objected forthwith orally or in writing. And it defies reality and experience even more to believe that their experienced attorney, familiar with the terms of the claimed agreement and having been consulted immediately upon receipt of the termination letter, would ignore it and not have counseled his clients to challenge forthwith in writing the asserted unjustified termination, even if he were of the view that the letter was without legal effect. Disbelief is heightened by the circumstance that according to the testimony of the Allens they stated to the attorney upon receipt of the termination letter that they felt Hammer was "tricky" and was trying to "freeze [them] out." [23] This court is fully sen-

sitive to the fact that in essence it is rejecting the testimony of the attorney and his clients on this subject—obviously a matter of concerned deliberation.[24] The conclusion is based not only upon a word-by-word study of the extensive trial record, the court's trial notes which include its contemporary appraisal of witnesses, the demeanor of witnesses who testified on the issues and the reasonable inferences to be drawn from established facts and all attendant circumstances, but also upon objective facts which persuasively establish that plaintiff acquiesced in and consented to the termination of the alleged agreement.

First, is the fact already referred to, the lack of immediate protest to the letter of July 16, 1965. Second, is the fact that for a year and a half thereafter plaintiff made no claim or inquiry, orally or in writing, as to any alleged interest in the Libyan venture. It was not until January 31, 1967, the day the public press carried news of a large oil discovery by the defendant in the Libyan concessions, that plaintiff first inquired of the defendant as to the status of the "concessions granted to Occidental through the intervention of Ferdinand Galic."

I reject the testimony of the Allens that on several occasions subsequent to the receipt by them of the termination letter, Hammer orally acknowledged that the claimed contract was still in effect. Their trial testimony, at points, is contradictory and, in several instances, is at variance with their pretrial depositions. In light of their attitude that they considered Hammer tricky and was trying to freeze them out, it is of significance that if in fact Hammer had acknowledged the continued existence of the alleged joint venture and plaintiff's 25% interest therein, they did not ask for a written confirmation of the acknowledgment or send one themselves or request a withdrawal of the termination letter.

22. T.R. 447.

23. T.R. 484–485.

24. *Cf.* Fuller v. Dilbert, 244 F.Supp. 196 (S. D.N.Y.1965), aff'd, 358 F.2d 305 (2d Cir. 1966).

Third, is a written disclaimer by the Allens of relationship with Occidental. Allen & Company Incorporated (the Company) had been organized by plaintiff in March 1964 to handle investment matters formerly carried on by it; Herbert Allen was Chairman of its Board of Directors and Charles Allen was also a director; they and their families owned a majority of the corporation's stock. Plaintiff was aware in the latter part of February and no later than early March 1966 that Occidental had been awarded the two concessions by the Libyan government. In May 1966 the Company was part of the underwriting group in a $61,186,300 convertible subordinated debenture issue of defendant. The Company filed an underwriter's questionnaire wherein it stated:

> "Neither we or any of our directors, officers or partners have a material relationship with the company [Occidental]."

The disclaimer was signed by Herbert L. Stern as Vice President. Charles and Herbert Allen each denied knowledge of this disclaimer, but I find that each knew of it. The disavowal of knowledge borders on the frivolous in view of all the evidence of the relationship between the plaintiff, the two Allens and their corporate creation, Allen & Company Incorporated. Stern was under the direct supervision of the Allens, had been in the plaintiff's employ for twenty years prior to the formation of Allen & Company Incorporated, continued to serve plaintiff thereafter and had access to all files, plaintiff's as well as the Company's. Stern was not called as a witness

by plaintiff nor was his deposition offered. The plaintiff argues that in any event the representation was not material. I hold it was.[25] Additionally, the registration statement and the prospectus issued in connection with the public offering referred to the Libyan concessions as owned by defendant and stated that fifteen million dollars of the proceeds would be used for oil and gas development in Libya and elsewhere. There is no statement that plaintiff had any interest in the Libyan oil venture; if in fact it had such an interest, this was an omission of a material fact.[26] In any event, even though it may be as plaintiff asserts that no purchaser of Occidental was misled, the representation that no officer or director of Allen & Company Incorporated had a material relationship to Occidental and the omission in the prospectus of any claimed interest by plaintiff in the Libyan oil venture are admissions against interest and militate against its contention that it did not acquiesce in the termination notice. The omission from the prospectus of any claimed interest by plaintiff in the Libyan concessions referred to therein takes on even greater significance since plaintiff's counsel, who had knowledge of the termination letter, read the document shortly after it was executed and neither questioned it nor suggested any changes or amendments.

Fourth—and even more compelling— is a letter sent by plaintiff to defendant on August 2, 1966, more than a year after the termination letter. Plaintiff requested that defendant confirm to plaintiff's auditors those ventures in which it

---

25. Clearly a reasonable investor about to purchase Occidental securities under the offering would have considered it important to know that an underwriter's principals or directors had a 25% partnership interest in a project as to which the borrower Occidental intended to apply all or a portion of $15,000,000 of the proceeds of the issue. An investor given such information might view with more critical judgment the soundness of the offering. Cf. Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S. Ct. 1456, 31 L.Ed.2d 741 (1972).

26. A prospective purchaser of securities would also be entitled to know that Occidental did not own the Libyan oil concessions 100% and that in the event of profit it would only receive 75% thereof. Cf. Sonesta Int'l Hotels Corp. v. Wellington Assocs., 483 F.2d 247, 251 (2d Cir. 1973); Chris-Craft Indus., Inc. v. Piper Aircraft Corp., 480 F.2d 341, 362–363 (2d Cir.), cert. denied, 414 U.S. 910, 94 S.Ct. 232, 38 L.Ed.2d 148 (1973); SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (2d Cir. 1968) (en banc), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).

had a participating interest with the defendant, and after identifying two specific ventures unrelated to this case, inquired as to "[a]ny other program in which we have a participation." The defendant in answering named a third venture, a 1963 project also unrelated to this case. Significantly, plaintiff never mentioned the Libyan project and it accepted defendant's statements which likewise made no reference thereto. Thus, each recognized the non-existence of any joint venture with respect to the Libyan oil exploration.

Fifth, plaintiff, fully aware that substantial expenditures were being made by defendant over an extended period not only made no inquiry of it as to the costs, but never offered to make any financial contribution thereto, and failed to set up a single penny on its books as a reserve against the Libyan oil venture or make any entry therein as to any contingent liability.

 Upon this record the proof is overwhelming that plaintiff, by its acts and conduct, acquiesced in and consented to the termination of its claimed agreement with defendant; indeed, the conduct of plaintiff is also sufficient to sustain the defense of estoppel.[27] I further find that plaintiff agreed with the defendant that by reason of the acts and conduct of the Galic group it was justified in cancelling its agreement with the Galic group; and I find that in sending the termination notice so accepted by plaintiff, the defendant did not violate any of plaintiff's rights. In sum, the evidence warrants the conclusion that the plaintiff sought the best of two worlds as to the Libyan oil project. If oil was struck, it could claim a 25% profit in the joint venture; if it turned out to be a dry hole, it could disavow liability for 25% of the loss, pointing to defendant's termination letter. Plaintiff cannot have it both ways. The

highly speculative nature of the enterprise, entailing a risk of many millions of dollars of which plaintiff was well aware, gives added emphasis to plaintiff's acts and conduct and its silence for more than a year and a half until the public announcement of an oil gusher in the concession. Plaintiff, aware that heavy costs were involved both before and after obtaining the concession, stood by silently while defendant assumed the risk of an extremely heavy financial loss. The totality of its conduct forecloses it from now being heard. What was said in another case involving a mining claim is particularly applicable here:

"A person may not withhold his claim awaiting the outcome of a doubtful enterprise and, after the enterprise has resulted in financial success favorable to the claimant, assert his interest, especially where he has thus avoided the risks of the enterprise. The injustice of permitting one, holding the right to assert an interest in property of a speculative character, to voluntarily await the event and then decide, when the danger is over and the risk has been that of another, to come in and share the profit, is obvious. In such circumstances, persons having claims to property are bound to use the utmost diligence in enforcing them.

"Silence under such circumstances when, according to the ordinary experience and habits of men, one would naturally speak if he did not consent, is evidence from which assent may be inferred. Where a plaintiff, with knowledge of the relevant facts, acquiesces for an unreasonable length of time in the assertion of a right adverse to his own, the court may presume assent to the adverse right, and the consequent waiver of the right sought to be enforced."[28]

27. Electrolux Corp. v. Val-Worth, Inc., 6 N. Y.2d 556, 564, 190 N.Y.S.2d 977, 161 N.E.2d 197 (1959); Pollitz v. Wabash R.R., 207 N. Y. 113, 129, 100 N.E. 721 (1912); Rothschild v. Title Guarantee & Trust Co., 204 N.Y. 458, 97 N.E. 879 (1912).

28. Pfister v. Cow Gulch Oil Co., 189 F.2d 311, 315 (10th Cir.), cert. denied, 342 U.S. 887, 72 S.Ct. 177, 96 L.Ed. 665 (1951).

**1064**

## DID GALIC "TURN UP" THE CONCESSIONS?

■ The foregoing findings should terminate the matter but, since there may be appellate review, it is also desirable to pass upon the issue of whether the concessions awarded to Occidental were "turned up" by Galic.[29]

In 1965, the Kingdom of Libya publicly invited companies to submit bids for oil concessions in Libya, such bids to be filed not later than July 29, 1965. On that date, the defendant[30] submitted its bid for oil concessions, which included a proposal for the development of a chemical fertilizer industry and an agricultural project. In all, one hundred twenty applications or bids were submitted by thirty companies or combinations of companies, including American companies such as Esso, Phillips Petroleum, Sun Oil, Mobil, Gulf, Sinclair, Cities Service, Richfield, Texaco and Atlantic. As previously noted, on February 20, 1966 the Libyan government publicly announced the award of the concessions of Blocks 42B and 44 to Occidental of Libya, Inc. The plaintiff claims that these concessions were "turned up" as a result of Galic's intervention and efforts.

The term appears in the letter of December 17, 1964 previously quoted. The complaint alleges that, pursuant to the agreement of joint venture, the defendant "utilized the intervention and services of . . . Ferdinand Galic on behalf of the said joint venture and . . . Galic turned up two oil concessions" awarded to defendant. The nature of the services intended by the expression "turned up" is nowhere clearly defined by the parties. At best, such services could entail public relations activities, creating goodwill for Occidental in support of its application for the concessions, facilitating ready access to, and discussions with, Libyan officials who were influential in the granting of the oil concessions—in general, establishing a good public image of Occidental as a responsible and competent bidder whose development of oil concessions would be advantageous to Libya. At worst, they could involve influence peddling, if not corruption of public officials. It is assumed, however, that "turned up" was intended to encompass only legitimate activities.

In any event, the parties do not agree as to the scope of the services required of Galic. Plaintiff contends that "turned up" did not mean that Galic had to be the procuring cause of the granting of the concessions; that Galic duly performed thereunder if he initiated governmental interest in the project on behalf of the joint venture and rendered public relations services in visits and discussions of the matter with the Minister of Petroleum and other officials; supplying such information as the Ministry of Petroleum required and using persuasion to induce the Libyan Ministry to exercise its discretion favorably with respect to Occidental's application.

The defendant's position is that due performance required that the concessions be obtained through the efforts

---

29. Plaintiff's present contention that Galic was not required to "turn up" the concessions for plaintiff to be entitled to an interest in them disregards its own theory of the alleged agreement as well as its counsel's repeated stated position. The December 17, 1964 letter that plaintiff relies on to support the alleged agreement specifically states ". . . Occidental will share on the basis of 75% for us and 25% for you [plaintiff] on *anything Ferdinand Galic turns up* [emphasis added]." Further, when Herbert Allen wrote to Hammer on January 31, 1967 inquiring as to the status of the alleged joint venture, he stated: "We have been reviewing our agreement with Occidental Petroleum which provides that Occidental and Allen & Company will participate, on a 75%–25% basis, in any venture resulting from the Libyan oil concessions granted to Occidental *through the intervention of Ferdinand Galic* [emphasis added]." *See also* ¶ 5 of the Amended Complaint. Moreover, much evidence otherwise inadmissible was received on representations by plaintiff's trial counsel that "one of the issues is whether Galic turned up the concessions. . . ." *See, e. g.,* T.R. 464; *see also* citations at footnote 18.

30. Through its subsidiary, Occidental of Libya, Inc.

and intervention of Galic—that he was to play a significant role in procuring the award. In support of this view, the defendant emphasizes that at the London conference repeated representations were made by the Galic group that the award of the concessions could be advanced through negotiations with government officials, and that the letter agreement then signed with Galic provides that: "If for any reason Occidental does not acquire Oil and Gas concessions in Libya as the result of your intervention Occidental will be free of any obligation whatsoever towards you."

Plaintiff's contention as to the nature of the services Galic was required to render is somewhat restricted. Nevertheless, even accepting plaintiff's definition and applying its standard, the record does not support the claim that Galic performed as required.

 Despite the termination of Galic's services by Occidental in July 1965, plaintiff contends that with the defendant's consent Galic continued to exert efforts in furtherance of, and was instrumental in, procuring the concessions for defendant—in the words of plaintiff's trial counsel, he "was highly influential in obtaining the granting of these concessions to Occidental." [31] In large measure, this claim is based upon Galic's purported relationship with Kabazi, who was the Minister of Petroleum Affairs, Chairman of the Libyan High Council of Petroleum Affairs and a member of the Council of Ministers. Essentially, it is contended that Galic had the confidence of Kabazi, who, by virtue of his offices, played a dominant role in the appraisals of the various applications for concessions; that Galic assured Kabazi that Allen & Company would supply defendant with all financial support required for the project; that Galic personally persuaded Kabazi to support Occidental's application, and Kabazi in turn influenced the Council of Ministers, the final authority, to exercise their discretion so as to grant the defendant the

concessions. However, the record does not support these and other claims. The evidence establishes that the bidding for the concessions was strictly competitive and that Occidental received the award solely on its own merits and financial capacity.

Galic's testimony, enlarging upon ephemeral activities of a so-called public relations nature that purportedly influenced or furthered the award of the concessions to defendant, is belied by his own statements in letters and cablegrams sent to deRovin. It would be a work of supererogation to list the many falsehoods and contradictions contained in that correspondence which negate the claim now advanced that Galic played any role in furthering the application. Several items may be briefly noted. In July 1965, during the period Galic claims he was the confidant of Kabazi, he complained to deRovin that he could not get to speak to Kabazi—that twice he was rebuffed. On February 22, 1966, two days after the public announcement of the award, Galic wrote to deRovin that he had just learned Occidental had obtained the concessions and asked if deRovin could learn what blocks or concessions had been granted to it—an item of some significance in view of the Kabazi letter of February 16, 1966, yet to be discussed. Caught in a web of falsehoods by this correspondence, Galic sought to extricate himself by testifying that he lied to deRovin to mislead him and to keep him out of the deal. But there is more than this perfidious conduct which mars his testimony. His glib and facile explanations of falsehoods and contradictions are implausible. A careful word-by-word reading of the record compels the conclusion that Galic's testimony is utterly lacking in credibility.

Plaintiff, however, seeks to bolster its claim that Galic did indeed render significant service by a letter dated February 16, 1966—four days before the public announcement of the granting of the

31. T.R. 24.

concessions—which Kabazi testified he personally typed, signed and mailed to Galic that day, and which Galic testified he received within a day or two of its date. This letter engendered much controversy, if not acrimony, among the lawyers and was the subject of extensive and conflicting expert testimony. An inordinate amount of time was spent on it, and extraordinary expenses incurred by the parties for the experts and trips of witnesses to and from Europe.

As this court noted several times during the trial, the letter's importance in terms of the basic issues in the case was highly exaggerated.[32] The defendant contends that the letter is spurious in that it was backdated, a claim that the court finds has merit. Apart from that issue, however, its contents are inadmissible hearsay and include self-serving statements. Moreover, even if it were admissible, it is of minimal probative value. Nevertheless, the letter does serve to expose the acts and conduct of both Galic and Kabazi.

The "Kabazi" letter reads:

"KINGDOM OF LIBYA
Ministry of Petroleum Affairs
*Special File* Tripoli, 16/2/66
Mr. Ferdinand Galic
41, Rue Spontini
Paris 16
*France*

Dear Sir,

You will be pleased to know that shortly Occidental Petroleum will receive a favorable reply in its bid for petroleum concessions in Libya.

As I have repeatedly stated to you, in the interest of my country, our policy in the granting of petroleum concessions is based on capacity of the companies to absorb fully their output. As you well know, the interest of my country is above every thing in my heart. I wish, therefore, to remind you, that you have assured me on two very important points:

1. that Occidental Petroleum is in a position to absorb any amount of oil found;

2. that Messrs. Allen & Co. of 30, Broad Street, New York, N. Y., USA, assures the necessary financing involved.

With sincerest regards,
truly Yours,
/s/ Fuad Kabazi
(Fuad Kabazi)
Minister of Petroleum Affairs"

In the light of the well-documented official files kept by the Libyan government of all bids for concessions and supporting documents, and the Libyan law protecting the confidentiality of documents and decisions until officially released, the letter contains within itself the seeds of suspicion and gives one cause to wonder why this "unsolicited" extra-curricular letter was sent. It is unnecessary to resolve the conflict between the expert witnesses as to the make of the machine upon which it was typed, or whether a carbon copy was made. Objective facts are more compelling. Although Galic testified he received the letter within a day or two after its date, as already noted, on February 22, he wrote to deRovin asking him to try to get information as to the award of the concessions and the block numbers. Subsequently, even after the concession contracts were signed, Galic's letters to deRovin show a lack of knowledge regarding the concessions. Further, both Kabazi and Galic testified that from the inception of their relationship they had agreed to destroy all correspondence between them and each testified he had adhered to the arrangement. In this circumstance, it is singular that the only document not destroyed is the letter dated February 16, 1966. It is also odd that the letter is written in English, although in their prior correspondence Kabazi wrote in Italian and Galic responded in French. Although Occidental obviously was a much interested party, no copy was ever sent to it

---

32. *See, e. g.,* T.R. 2973, 2978.

by Galic or Kabazi. Its existence was first made known to Occidental during the course of the pretrial proceedings late in 1967. Charles Allen testified he received a copy in the mail in March 1966 without a covering letter. Galic, in contradiction, testified he never mailed a copy in March 1966 to Allen but to a lawyer for Allen & Company. The lawyer, on the other hand, testified he did not see a copy of the letter until the spring of 1967.

Kabazi testified that to assure secrecy he immediately destroyed the carbon used to make the copy and personally placed the copy in a "special file" under lock and key in his office, which file he turned over to his successor upon leaving government service. Yet an official government certificate in evidence states that no such letter is contained in the official files.[33] In all prior correspondence Kabazi wrote on private stationery; here, official government stationery was used. In no other instance did Kabazi make a copy of his letters to Galic. The existence of the letter was never made known by Kabazi to either the members of the High Petroleum Council or to the Council of Ministers. The disclosure of the confidential information in the February 16 letter, if sent four days before the award, constituted, as Kabazi knew,[34] a criminal offense under Libyan law that would have subjected him to criminal prosecution.

Even more singular is the statement in the letter and Kabazi's testimony that he had relied on Galic that Allen & Company "assures the necessary financing involved." The official files of the Libyan government contain no document that refers to Allen & Company or Galic; the Libyan government at no time requested Allen & Company to submit any financial data in support of defendant's application; Allen & Company never submitted any such information; the defendant's bid for the concessions contains no reference to Allen & Company. Despite Kabazi's claimed reliance upon Galic's personal assurance of Allen & Company's support of the project, he never asked Galic for any documentation that Allen & Company was in fact Occidental's financial backer, and never requested a financial statement of, or drew a credit report on, Allen & Company. The only financial data submitted in defendant's bid related to Occidental, and included a letter from Chase Manhattan Bank setting forth Occidental's net worth as well as financial reports of Occidental.

As to the further statement in the February 16 letter that Kabazi was assured by Galic that Occidental Petroleum was in a position to absorb any amount of oil found, the fact is that Occidental as part of its bid in July 1965 had submitted a letter of commitment from Signal Oil and Gas Company, which had the requisite refining and marketing capacity. Indeed, in July and August 1965, eight months before the date of his letter to Galic, Kabazi already recognized that Signal was a "good company"[35] with worldwide facilities and a marketing capacity sufficient to absorb any oil Occidental found.

The totality of evidence warrants the finding that the Kabazi letter was deliberately contrived and written sometime after the awards were announced on February 20, predated to February 16 and sent to Galic, in an effort to aid Galic in a contemplated lawsuit against Occidental.[36] The record establishes

33. *Cf.* Deshong v. City of New York, 176 N. Y. 475, 485, 68 N.E. 880 (1903).

34. T.R. 1719–20.

35. T.R. 1592; 1689–93.

36. On October 13, 1965, he wrote to Herbert Allen: "Yesterday the lawyers got in touch with me on account of Occidental Petroleum, they suggested that I do nothing and wait until OCCIDENTAL PETROLEUM gets the concessions. . . . I will by no means be associated with Dr. HAMMER and OCCIDENTAL PETROLEUM, all I want is the reimbursement of the damage. The lawyer says that for the time being, I can only claim the reimbursement of the expenses, but when they will have the concessions, I can claim for the damage, whether they find oil or not."

that Galic's principal activities after he received the termination notice in July 1965 were not intended to and did not further defendant's interest in obtaining the concessions; rather, they were directed to furthering his own interests in building up a claim against defendant while he awaited the award of the concessions to Occidental as a propitious time to commence his legal action. The objective factors establish that such was the purpose of the Kabazi letter. I find Kabazi's testimony, just as Galic's, with inherent contradictions and implausibilities, incredible and unworthy of belief. Kabazi's testimony reflects bias in favor of Galic and hostility towards defendant.[37] One searches in vain for any tangible or credible evidence that in fact Galic, whether by reason of his claimed relationship to Kabazi or otherwise, played any part in furthering the application for the concessions. Occidental was the successful bidder for the award not only because of its financial responsibility and technical competence, but in some measure because of the inclusion in its bid of the fertilizer and agricultural projects, one of which obligated Occidental to develop a thirty million dollar ammonia plant even if no oil were found.[38]

A final word. While the court, as to material matters, has rejected the testimony of plaintiff's principal witnesses, it does not necessarily follow that it has adopted in totality Hammer's testimony which, as to some matters, was not entirely acceptable. However, the findings and disposition made herein are warranted by credible evidence, documentary evidence and the burden of proof on the respective parties.

The foregoing, together with the matters stipulated by the parties in the pretrial order to the extent they may not be included herein, shall constitute the court's findings of fact and conclusions of law.

Judgment in favor of the defendant may be entered accordingly.

---

37. During his deposition, when questioned closely about Galic, his evasive responses were such that the proceedings were disrupted for a period. T.R. 1856, et seq.

38. T.R. 1647.