**George and Larry "CHILD" et al., Plaintiffs,**

v.

**Abraham BEAME, etc., et al., Defendants.**

**No. 75 Civil 336.**

United States District Court, S. D. New York.

Jan. 19, 1977.

Marcia Robinson Lowry, Children's Rights Project, New York Civil Liberties Union, New York City, for plaintiffs; Steven R. Shapiro, New York City, of counsel.

W. Bernard Richland, Corp. Counsel, New York City, for City defendants; Beryl M. Kuder, Asst. Corp. Counsel, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen., State of New York, New York City, for State defendants; Judith T. Kramer, Asst. Atty. Gen., New York City, of counsel.

Fox, Glynn & Melamed, New York City, for defendants Burbank, Stone and Wiener; John R. Horan, Kathleen M. Kundar, New York City, of counsel.

OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDWARD WEINFELD, District Judge.

This action was brought by a self-designated "next friend" on behalf of five black

children who have been the legal responsibility of the New York City Department of Social Services. The Department placed the children with authorized child-care agencies, which had the immediate responsibility for their welfare and foster care. The children, who have been in the New York City child-care system under foster care for varying periods of time, have not been referred for adoption, although it is asserted their relationship with their natural parents has been or could be legally terminated.[1] The basic claim, however variously phrased, is that the defendants, acting singly or in concert, have engaged in a practice, policy and custom of racial discrimination which has denied the five named plaintiffs access to adoption equal to that of white children, and thus denied them a stable, permanent home by keeping them in their temporary foster homes during their entire childhood. This denial was allegedly effectuated by defendants' arbitrary and discriminatory practices, viz., (1) failing to make plaintiffs "legally free" for adoption[2] either through appropriate court proceedings or by obtaining an unconditional surrender from their natural parents; (2) failing to refer plaintiffs to a licensed adoption division operated by a defendant or by any other authorized child-care agency; and (3) failing vigorously to seek a permanent preadoptive or adoptive home with persons available and willing to adopt the plaintiffs—in sum, the claim is that were the plaintiffs white children they would have been adopted long ago.

It is alleged that these practices, customs and policies violate plaintiffs' constitutional rights under the First, Eighth, Ninth and Fourteenth Amendments of the Federal Constitution and violate their statutory rights under Title VI of the Civil Rights Act of 1964. Declaratory and injunctive relief and damages are sought under 42 U.S.C., sections 1983, 1985, 1986 and 2000d, and 28 U.S.C., sections 2201 and 2202. Jurisdiction is asserted under 28 U.S.C., section 1343(3) and (4), as well as under 28 U.S.C., section 1331(a) on allegations that the matter in controversy involves a sum in excess of $10,000.

The plaintiffs Larry and George "Child" are brothers and were born, respectively, on March 4, 1962 and March 4, 1963. They have been in the New York City child-care system from on or about November 10, 1963 to the present. Plaintiffs Michelle and David "Child" are sister and brother, and were born, respectively, on May 11, 1962 and March 12, 1964. They have remained continuously in the New York City child-care system from on or about August 11, 1966 to the present. Plaintiff Mona "Child" was born on April 13, 1960 and has been in the New York City child-care system from February 4, 1966 to the present.

All five children, from the commencement of this action to the present, have been under the care and responsibility of the defendant Abbot House, a voluntary child-care agency. At various times prior thereto they were under the care and responsibility of the defendants Windham

---

1. Just before the conclusion of this trial the natural parent of one child legally surrendered her right to its custody and care.

2. A child is legally free for adoption when his natural parents' claims to custody are permanently severed under the law. The natural parents may consent to such a divestment of their interests by "surrender" of the child to an authorized agency for adoption. N.Y. Soc. Serv. L. § 384 (McKinney's 1966 & Supp.1975). However, even if the natural parents do not so

consent, the child may be freed by the New York State Family Court under Article 6 of the Family Court Act, §§ 611–34 (McKinney's 1963 & Supp.1974). This statute provides for a "proceeding permanently to terminate the parent's or other custodian's custody," *id.* § 614, upon the court's adjudication that the child is "permanently neglected" under § 611.

Children's Services and Child Care Agency or Sheltering Arms Children's Services, also voluntary child-care agencies. The defendants are these child-care agencies and their executive directors; also, the New York City Commissioner of Social Services and other city officials responsible for the child-care program; and the New York State Department of Social Services and officers of that Department who under state law have general supervision of local child-care and adoption agencies.

The foster homes and the executive directors deny the alleged policy, custom or practice; they deny discrimination on the basis of race; they contend that the actions taken by them as to each child plaintiff were based on providing the best opportunities for the child's growth and development.

The New York City Commissioner of Social Services and other city defendants assert that annually they have authorized and approved each plaintiff's placement in a foster home on an equal basis with all children placed in the care of voluntary child-care agencies, regardless of race; they deny that the annual reauthorization of plaintiffs' placement reflects discriminatory treatment or was undertaken in a discriminatory manner; to the contrary, they assert it was made pursuant to practice and policies applied equally to all children subject to placement with child-care agencies, regardless of race. These defendants further deny that they have taken any action or failed to take any action, either individually or in concert with other defendants, to deprive plaintiffs of their constitutional or statutory rights.

The state defendants disavow any statutory duty to run checks or examine the files of individual plaintiffs; they contend that they are required by law to make general inspection of voluntary agencies and to supervise the administration of the New York City child-care system by Special Services for Children,[3] which is a division of the Human Resources Administration within the New York City Department of Social Services, the agency with overall responsibility for providing services for New York City children in need of care.[4] Finally, the state defendants also deny that, either individually or in concert with any other defendant, they acted or failed to act so as to deprive any plaintiff of his or her constitutional or statutory rights.

This action was originally commenced as a class action by plaintiffs on behalf of themselves and other black children similarly situated. Plaintiffs also advanced claims on behalf of black and white children in foster homes charging violations of purported constitutional and statutory rights to adoption. This Court dismissed the latter claims and denied class certification, but allowed the action to proceed as to the five named plaintiffs upon the basis of an amended pleading charging racial discrimination.[5] Subsequently the complaint was dismissed as to all defendants except those referred to above.[6] Familiarity is assumed with the matters referred to in these opinions.[7]

At trial, plaintiffs offered far-ranging proof, much of it extending well beyond the claim that the failure to free these five "Child" plaintiffs for adoption and to place them with adoptive parents was racially

3. *See* N.Y. Soc. Serv. L. §§ 406–07 (McKinney's 1966 & Supp.1975).

4. *Id.* §§ 395–403.

5. 412 F.Supp. 593 (S.D.N.Y.1976).

6. 417 F.Supp. 1023 (S.D.N.Y.1976).

7. A preliminary observation is in order. Soon after the commencement of this action a motion was made to disqualify plaintiffs' alleged "next friend." In response he and his attorney, associated with the New York Civil Liberties Union, which has sponsored this litigation, filed affidavits to the effect that the "Child" plaintiffs had been interviewed, that they had expressed a desire for permanent, stable homes and adoptive parents, and that they had consented to the bringing of this class action on behalf of themselves and others similarly situated. Yet no child plaintiff was called to testify, although each is of sufficient age. In effect the case has been maintained exclusively by plaintiffs' counsel, and one wonders whether the children are aware of the prosecution of this action allegedly on their behalf.

motivated or discriminatory. Since the trial was to the Court, practically all proffered evidence was received, but the Court noted several times that only evidence relevant to the issues under the amended complaint would be considered.[8] The bulk of evidence concerns child-care, foster-care and adoption practices, customs and procedures, mainly in the City of New York, and problems arising therefrom. To the extent that such evidence is relevant to the issues in this case, the Court has given it due consideration. However, much of the other evidence has no bearing, direct or indirect, on the issue of racial discrimination against these five plaintiffs.

Plaintiffs presented the opinions of various experts who sharply criticized the practices of the state, city and authorized child-care and adoption agencies as inadequate to meet the needs of black children for permanent placement with adoptive families. Their observations were directed to alleged shortcomings and weaknesses of administrative practices and review procedures. Their criticisms in large measure were directed to alleged deficiencies in adoptive planning and placement that were endemic to the child-care system. The conflicting philosophies between public interest groups, on the one hand, and those charged with the administration of the child-care laws and the day-to-day responsibility for foster children, on the other hand, came into sharp focus. Plaintiffs' experts felt a better job could be done through more vigorous programs to obtain permanent adoptive homes, particularly for black children. As in the instance of most bureaucratic programs, there is probably room for improvement. Indeed, the record reflects continuing concern of those charged with responsibility for the care and welfare of children in the child-care system to place them promptly in available adoptive homes when reunion with the natural parents is not feasible and the family cannot be reconstituted.

The problem is difficult and extraordinarily complex. A hard fact that cannot be ignored, however, is that a far greater number of black children than white children are in foster care, yet the number of black families with whom such children might potentially be placed for adoption is much smaller than the corresponding number of white families in the general population. Entirely apart from this, social and economic pressures on minority families, which are more likely to accept black children for adoption, make it more difficult for such families to take adoptive children into their homes. With the passage of time, the state and city administrators, as well as voluntary agencies, on their own initiative or under the spur of criticism by public interest groups and the legislature, have applied innovative methods to stimulate a greater pool of available and qualified potential adoptive parents and to eliminate barriers to adoption. These efforts have included bilingual publicity programs, use of television, radio and news media, "photo-listing" of available children, subsidy payments to encourage low-income families to provide adoptive homes, increased reimbursement payments to agencies for placement of children and extensive outreach activities. The various programs were geared to encourage adoption of "hard to place" children.

The dogmatic view of some of plaintiffs' experts, whatever their enthusiasm, that all foster care children, regardless of individual problems and needs, can successfully be placed for adoption is unrealistic and disregards substantial evidence that black children are harder to place for adoption than white children. Conceptual theories of these experts, who without administrative responsibility advocate methods to achieve ultimate perfection in adoptive placement, must yield to the reality of fact and experi-

---

**8.** *See United States v. 1,291.83 Acres of Land,* 411 F.2d 1081, 1086 (6th Cir. 1969); *Reid v. Quebec Paper Sales & Transp. Co.,* 340 F.2d 34, 38 (2d Cir. 1965); *United States v. 396 Corp.,* 264 F.2d 704, 709 (2d Cir.), *cert. denied,* 361 U.S. 817, 80 S.Ct. 60, 4 L.Ed.2d 64 (1959); *New York Life Ins. Co. v. Harrington,* 299 F.2d 803, 806 (9th Cir. 1962); *Allen & Co. v. Occidental Petroleum Corp.,* 382 F.Supp. 1052, 1054–55 (S.D.N.Y.1974), *aff'd,* 519 F.2d 788 (2d Cir. 1975).

ence. We deal with children who are scarred almost from birth and who ofttimes present difficult personal, mental, physical, emotional and behavorial problems, precluding ready adjustment to new familial relationships. These children are human beings, not statistics. As this Court stated in its prior opinion: "Each adoption presents individual problems related to the particular child, its natural parents and its proposed adoptive parents. . . . [A]doption requires adoptable children and families willing and able to take children into their homes, which obviously varies from case to case."[9] As the Court observed several times in admitting questionable evidence, it was not sitting as a legislative oversight committee to review the alleged shortcomings of administrators or their programs or policies, but rather to determine whether the "next friend" of plaintiffs had sustained his burden of proof on the charge that the failure of defendants to free them for adoption or to place them with adoptive parents was because of racial discrimination.

To support the charge of racial discrimination, the individual case file of each "Child" plaintiff was reviewed by expert witnesses who expressed opinions that each of the five named plaintiffs could at some point have been placed with an adoptive permanent parent, and indeed would have been had they been white. The defendants, on the other hand, called the caseworkers and therapist at Abbot House who knew and worked with the children. Their testimony was based upon contact with the children and personal knowledge of pertinent facts touching upon each child, its habits, its individual problems, its relationship to others, its adoptability and other factors pertinent to a placement program. Each denied that the decisions concerning placement with an adoptive family in any respect was based upon or influenced by considerations of race.[10]

Plaintiffs also relied upon a statistic contained in a study entitled "Foster Care Needs and Alternatives to Placement," which was commissioned by the State Board of Social Welfare. The study indicates that in 1974 adoption was the preferred—but not yet effected—form of placement for 4.7% of the white children and for 16.8% of the black children in the New York City child-care system.[11] Plaintiffs, emphasizing the disproportion in placement reflected by this statistic, contend it establishes the claim of racially discriminatory patterns, policies and practices and their impact upon the five "Child" plaintiffs. However, in stressing this statistic, plaintiffs disregard both the balance of the 119-page report and substantial testimony. Dr. Blanche Bernstein, who co-authored the report, was called by plaintiffs as a witness and qualified by defendants as an expert. Her testimony was persuasive and convincing. Dr. Bernstein, as well as Bernard Shapiro, executive director of the State Board of Social Welfare, not only rejected the contention that the discrepancy in placement reflected racial discrimination, but gave cogent testimony explaining the underlying causes for the difference. In substance, they testified that the problem was one of supply and demand and identified factors that contributed thereto, including reasons for initial placement (whether due to problems of parents or of the child), age, religion, special needs and characteristics of the child, and limited availability of black adoptive parents. Essentially, the testimony was that the statistical evidence reflects demographic supply and demand factors—there is a relatively large supply of black children available for a relatively limited market of potential adoptive homes for such children; conversely, there is a relatively small supply of white children available for a relatively large market of potential adoptive homes for them. For the year 1974, to which the

9. *Child v. Beame,* 412 F.Supp. 593, 605 (S.D.N.Y.1976).

10. *See Powell v. Workmen's Compensation Bd.,* 327 F.2d 131, 137 (2d Cir. 1964).

11. Plaintiffs' Exhibit 9, Table 30 at 115.

statistic applies, the number of black children in New York City for whom adoption was the preferred placement was approximately 2,735, whereas the number of white children for whom adoption was the preferred placement was approximately 284. The population of New York City (the potential adoptive resource) consisted of approximately 1.6 million blacks and approximately 4.6 million whites. Relatively then there were less black parents to adopt more black children, and there were more white parents to adopt less white children.

The statistical evidence relied upon by plaintiffs fails to support the charge of system-wide racial discrimination, and in no respect does it support the charge as to these five plaintiffs. The views of several of plaintiffs' experts that despite continued efforts to increase the supply of adoptive black parents, misconceptions still prevail in the black community about adoption, and that any prospective black adoptive parents are often discouraged from applying for adoption by no means establishes, as plaintiffs argue, that these defendants have failed to correct and are responsible for such a state of affairs, or that it reflects a discriminatory racial attitude or practice. The record requires rejection of this tenuous contention. As already noted, the public administrators, in cooperation with voluntary agencies and public interest groups, including some with which plaintiffs' experts are affiliated, have carried on a vigorous campaign to increase the supply of black adoptive parents. To charge, as plaintiffs do, that city and state defendants were indifferent to the situation is to disregard substantial evidence of their intensive efforts to correct it.

Upon the totality of relevant evidence, the Court finds that the "next friend" of plaintiffs has failed to carry his burden of proof on any of the claims against the defendants; that he has failed to establish that the failure to free the five "Child" plaintiffs for adoption or to place them with adoptive parents was due to racial discrimination or to any policy or custom of racial discrimination engaged in either individually or in concert by the defendants. To the contrary, the Court finds that the continuation of the five children in foster care was not due to lack of vigorous effort to secure permanent adoptive homes for them, but was the result of considered judgments of caseworkers and professional specialists—judgments based solely upon factors centering about each child's welfare and best interest and related to its individual needs for growth and development. The factors considered by those in charge of planning for the five "Child" plaintiffs were the same factors considered in planning for all children similarly situated in care. Race was not one of these factors and race did not play any part in the defendants' policies, practices or actions affecting the children's welfare or planning.

The evidence failed to establish any basis to support a claim of intentional or purposeful invidious discrimination by defendants so as to bring into play a constitutional basis for relief under the Equal Protection Clause. Rather, the hard thrust of plaintiffs' position is that even in the absence of such intent they had established a prima facie violation of Title VI of the Civil Rights Act of 1964 [12] upon a showing that the impact of defendants' alleged policies or practices with respect to adoptive placement of children in foster care, even if facially neutral, disproportionately discriminated against black children.[13] The difficulty with that position is that plaintiffs have failed to establish the alleged policies or practices. On the contrary, proof offered by the defendants abundantly established that the disparate impact in the

---

**12.** 42 U.S.C. § 2000d, which prohibits racial "discrimination under any program or activity receiving Federal financial assistance."

**13.** *Cf. Village of Arlington Heights v. Metropolitan Housing Development Corp.,* —— U.S. ——, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977);

*General Elec. Co. v. Gilbert,* —— U.S. ——, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976); *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 2051, 48 L.Ed.2d 597 (1976).

placement of black children for permanent adoption is due to the fewer number of families willing to adopt them, a factor which cannot be attributed to defendants and which they have sought to ameliorate by various outreach programs referred to above.

This finding necessarily disposes of plaintiffs' various constitutional and statutory claims.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.

Judgment may be entered in favor of all the defendants dismissing the complaint upon the merits.