**MR. GREENJEANS CORPORATION,**
**Plaintiff,**

v.

**OLYMPIA & YORK PROPERTIES COM-PANY, O&Y Operating Corp., O&Y 1010 Building Corp., Fame Associates, Abraham H. Fruchthandler, Edward J. Minskoff and Fruchthandler Brothers Enterprises, Defendants.**

81 Civ. 5475.

United States District Court,
S. D. New York.

Nov. 6, 1981.

Berger, Steingut, Weiner, Fox & Stern, New York City, for plaintiff; Robert A. Weiner, Peter R. Stern, New York City, of counsel.

Kaye, Scholer, Fierman, Hays & Handler, New York City, for defendants; Jay Wishingrad, Jay G. Strum, New York City, of counsel.

## OPINION

### EDWARD WEINFELD, District Judge.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff by this action seeks specific performance of an agreement to lease space in an office building owned by the defendants and also seeks money damages for breach of the agreement. The defendants deny the existence of a valid lease and claim that their agreement was properly terminated in accordance with its terms. Simultaneously with the commencement of this action, plaintiff moved for a preliminary injunction to prohibit the defendants from leasing the space to any other person. In view of the substantial controverted issues of fact raised by defendants' opposition to the motion for preliminary injunctive relief, which required a hearing,[1] the Court ordered a trial of the action on the merits advanced and consolidated with a hearing of the application, pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure. The principal witnesses at the trial were executives of the respective parties who executed a letter agreement referred to hereafter and were also involved in subsequent events, as well as counsel or solicitors representing the respective parties.

Based upon the Court's trial notes, a word-by-word rereading of the entire trial transcript, an appraisal and evaluation of the credibility of witnesses, the totality of testimonial and documentary evidence, and the reasonable inferences to be drawn therefrom, the Court concludes that plain-tiff has failed to sustain its burden of proof that a valid and enforceable lease between plaintiff as tenant and defendants as landlord is in effect; accordingly, defendants are entitled to judgment on the merits dismissing the complaint.

Plaintiff is a Canadian corporation engaged in operating four restaurant-lounge establishments under the trade name, Mr. Greenjeans ("Greenjeans") in Canada and the United States. The defendant Olympia & York Properties Company is a partnership consisting of other named defendants (collectively "O&Y" or "defendants"), which rehabilitated a midtown office building located between East 45th and East 46th Streets between Park and Lexington Avenues, New York City. The building has twenty-three floors with an interior atrium ("Atrium").

Greenjeans represented by Maury Kalen, its chief executive officer, and O&Y by Philip Reichmann, its leasing representative, negotiated for the leasing of space in the Atrium. The space was to be located on two levels, the ground and first floors fronting on Park and Lexington Avenues to be operated as a restaurant by Greenjeans, similar to those already in existence. The negotiations extended over a three-month period during which various draft proposals were considered. Finally, on March 31, 1981 a letter agreement ("letter agreement") was entered into by the parties.

### I. The Letter Agreement

The letter agreement enumerates twenty items, including the location, amount of space, use of the premises, assignment, financing, tenant's and landlord's work, term, renewal rights, and rental, which is based upon a specified percentage of the restaurant's gross sales, with a right to the landlord to terminate in the event annual gross sales are less than a specified amount. Other provisions that are of particular significance in this litigation are:

---

1. *See Visual Sciences, Inc. v. Integrated Communications Incorporated*, 660 F.2d 56 (2d Cir. 1981).

(18) Standard Lease Form—Tenant shall execute Landlord's standard lease form as amended by mutual agreement of the parties' solicitors, acting reasonably, and incorporating the terms and conditions contained in this Letter Agreement.

.    .    .    .    .

(20) ... Landlord shall promptly prepare a form of Lease incorporating the provisions contained herein and submit same to Tenant. If Tenant shall fail, for any reason, save and except the failure of the Landlord to act expeditiously or reasonably, to execute a lease within ninety (90) days after Landlord's first draft is submitted to the Tenant, Landlord may terminate this Letter Agreement.

■ Plaintiff contends that the letter agreement constituted a lease in and of itself, whether or not a lease was subsequently executed. This contention is without substance. Under New York law,[2] an agreement affecting an interest in real property in which a material term is left for future negotiation is unenforceable.[3] The rule applies with special force where the extraordinary remedy of specific performance is sought.[4] The letter agreement on its face reflects that Greenjeans and O&Y intended to leave material terms for future agreement and to be bound as landlord and tenant only if they did in fact arrive at a mutually satisfactory agreement as to the open terms. The preamble states that Greenjeans is "proposing to enter into a [l]ease," and paragraph 18 provides that it "shall execute" such a lease. The lease to be executed not only must incorporate the terms and conditions of the letter agreement, but also, those of the "[l]andlord's standard lease form as amended by mutual agreement of the parties' solicitors, acting reasonably." This is not a case where recourse to objective criteria will enable the Court to fill in the open terms that cannot be found within the four corners of the letter agreement.[5] Where, as here, the parties have stated the terms of their agreement in clear and unambiguous language, the construction of the contract is for the Court and evidence of the intention and acts of the parties plays no part in the decision of the case.[6] Since the parties did not intend the letter agreement to be their complete agreement, it does not constitute a binding lease.

■ And even if, as plaintiff contends, the letter agreement is ambiguous because the intent of the parties cannot be determined from its "four corners"[7] and consideration is given to extrinsic evidence[8] of the parties' conduct and all surrounding circumstances prior to and contemporane-

---

2. Jurisdiction is based upon diversity of citizenship and the parties agree that New York law governs the substantive issues.

3. *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 436 N.Y.S.2d 247, 417 N.E.2d 541 (1981).

4. 52 N.Y.2d at 110, 436 N.Y.S.2d at 249, 417 N.E.2d 541.

5. *See* 52 N.Y.2d at 110, 436 N.Y.S.2d at 249–50; *Metro-Goldwyn-Mayer, Inc. v. Scheider*, 40 N.Y.2d 1069, 392 N.Y.S.2d 252, 360 N.E.2d 930 (1976). *Cf. Allen & Co. v. Occidental Petroleum Corp.*, 382 F.Supp. 1052 (S.D.N.Y.1974), *aff'd*, 519 F.2d 788 (2d Cir. 1975); *May Metropolitan Corp. v. May Oil Burner Corp.*, 290 N.Y. 260, 264, 49 N.E.2d 13 (1943). Ms. Stark, Greenjeans' solicitor, whose practice was principally in commercial real estate leasing, testified, "[t]here is no acknowledged form" of lease for the type of operation that was contemplated. Trial Record at 173. Mr. Kalen, the chief executive officer and founder of Greenjeans, testified that the letter agreement did not include all the provisions of a landlord standard form of lease and "there are no two standard form leases that I have ever seen that are identical." Trial Record at 108.

6. *See Heller & Henretig, Inc. v. 3620–168th Street, Inc.*, 302 N.Y. 326, 330, 98 N.E.2d 458 (1951); *Hartigan v. Casualty Co. of America*, 227 N.Y. 175, 124 N.E. 789 (1919).

7. *Cf. Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 896 (2d Cir. 1976).

8. This evidence was received over defendants' objection. The Court noted, however, that since the case was nonjury, only material and relevant evidence would be considered in its determination. *Cf. Allen & Company v. Occidental Petroleum Corporation*, 382 F.Supp. 1052, 1055 n.2 and cases cited therein, *aff'd*, 519 F.2d 788 (2d Cir. 1975).

ous with the letter agreement,[9] the same conclusion is compelled. The record abundantly establishes that it was not the intention of the parties that the letter agreement by itself constitute a lease or create a landlord-tenant relationship—to the contrary, it was their intention that such relationship would arise only upon agreement on additional terms and the subsequent execution of a formal lease. "Reason, equity, fairness—all such lights on the probable intention of the parties—show what the real agreement was."[10] Prior to the execution of the letter agreement, Mr. Kalen, representing Greenjeans, had received a copy of O&Y's standard lease form and was aware that it contained matters of importance to both parties that were not addressed in the letter agreement. Moreover, Ms. Paula D. Stark, a Toronto solicitor representing Greenjeans, had redrafted a proposed letter agreement prior to the execution of the final one on March 31 and was aware of the reference to the landlord's lease form. Surely they must have understood that it contained "significant and serious" matters and that it "[w]as [not] all sound and fury, signifying nothing."[11] The cavalier attempt by Mr. Kalen and Ms. Stark in their testimony to brush off the lease form as mere "boiler-plate" disregards the realities of the situation that confronted the parties.

The standard lease form contained provisions that were of importance to both parties, that were not specified in the letter agreement. These included but were not limited to: (1) restrictive radius covenant in opening another restaurant; (2) structural repairs; (3) insurance and fire damage; (4) depreciation rights with respect to restaurant improvements; (5) who was to bear the cost of compliance with future enacted laws; (6) rights of the parties in the event the state exercises its power of eminent domain; (7) ownership of insurance coverage; and (8) subordination of lease to present and future mortgages or other encumbrances. Plaintiff's own witnesses testified that these terms can have a substantial financial impact on the landlord-tenant relationship. The terms were especially important here in view of the enormity of the parties' undertaking. The contemplated lease was for a ten-year term with two five-year renewal options and committed O&Y, among other matters, to the financing of the construction of the proposed restaurant to the extent of $1,000,000. The space to be leased was 10,000 square feet out of 45,000 total square feet available for rent to retail establishments in O&Y's newly rehabilitated large office and commercial building. The cost of its rehabilitation is alleged to have been approximately $100,-000,000. The tenants of the building include professional and commercial firms of substance. Thus the type and operation of the yet to be constructed restaurant, located at levels in the Atrium where persons leaving or entering the building passed by, was a matter of major concern to O&Y since it could have an adverse or favorable impact, and consequent impairment or enhancement of O&Y's substantial investment. Other apparent business and economic factors strongly suggest a purpose on the part of the landlord to protect its interests in the proposed landlord and tenant relationship as to which the letter agreement was silent. Equally, plaintiff, undertaking a substantial investment in a new venture and seeking to enlarge its operations, desired adequate protective provisions to ensure its tenancy and prospective benefits, and again these are not referred to in the letter agreement. Under the circumstances, to assert, as plaintiff does, that the letter agreement by itself was intended to be the lease between the parties is to disregard reality. Thus we next consider the actions and conduct of the parties in their efforts to reach agreement on the terms of the lease to be executed by plaintiff as required by paragraph 18 of the letter agreement.

**9.** *Becker v. Frasse & Co.*, 255 N.Y. 10, 14, 173 N.E. 905 (1930); *William C. Atwater & Co. v. Panama R.R.*, 246 N.Y. 519, 524, 159 N.E. 418 (1927).

**10.** *William C. Atwater & Co. v. Panama R.R.*, 246 N.Y. 519, 524, 159 N.E. 418 (1927).

**11.** *Outlet Embroidery Co. v. Derwent Mills, Ltd.*, 254 N.Y. 179, 183, 172 N.E. 462 (1930).

## II. Events After the Execution of the Letter Agreement

### A. The First and Second Drafts of Leases

Stephen Collins, who at that time was general counsel of O&Y, prepared "a first draft of a Leasehold Improvements Agreement and Lease." By letter dated April 15, 1981, he submitted the draft, a voluminous document of ninety-five pages plus riders, to Mr. Kalen who mailed it on April 28 to Ms. Stark. It was not until June 4 that Ms. Stark mailed to Mr. Collins a twenty-one page "Memorandum of Comments," which requested changes, additions, deletions and modifications of provisions contained in the first draft based upon her understanding of the "Letter of Intent," as she referred to the letter agreement. The Memorandum also included proposals on matters that were not mentioned in the letter agreement. Mr. Collins and Ms. Stark had several telephone conversations about the first draft and her Memorandum.

At this time, Mr. Collins was soon to terminate his relationship with O&Y as their general counsel, and Martin Polevoy, a New York lawyer, was substituted in his place. However, to expedite matters, Mr. Collins redrafted a document in an effort to reduce to some extent the areas of dispute ("second draft"). He sent this draft to Ms. Stark by mail on June 26, 1981 and advised her that Mr. Polevoy, who had received copies of it and other documents, "will be prepared to continue these negotiations as soon as you are ready." Mr. Polevoy took over his representation of the O&Y interests sometime in late June or early July, 1981, at which time Mr. Reichmann was abroad. Mr. Polevoy suggested to Ms. Stark that they meet in Mr. Reichmann's absence so that only a few issues would have to be dealt with upon his return, but she declined under Mr. Kalen's instructions, who insisted that Mr. Reichmann be present at their meeting. Pending Mr. Reichmann's return, Mr. Polevoy on behalf of O&Y, extended the ninety-day period referred to in the letter agreement an additional thirty days so that the expiration date was August 15, 1981.[12]

### B. The July 29th Meeting

On July 29, 1981, Ms. Stark and Messrs. Kalen, Reichmann, and Polevoy met in the offices of O&Y in Toronto, Ontario, for the purpose of considering the second draft proposals. As redrafted by Mr. Collins, the second draft was unacceptable to plaintiff and to the defendants.

Three matters of major concern to the parties and which from their respective interests they deemed unsatisfactory as set forth in the second draft were the assignment, use and restrictive radius provisions. At the outset of the meeting, Messrs. Polevoy and Reichmann stated that the assignment clause was erroneous as drafted and contrary to the provision in the letter agreement which contained a prohibition of assignment without the landlord's consent. Ms. Stark and Mr. Kalen also found it unsatisfactory; she was of the view that it was excessively long and extremely onerous to her client. Mr. Kalen sought to permit assignment and subletting of the lease under specified conditions.

Ms. Stark and Mr. Reichmann also questioned the use clause since each felt that the language did not reflect the intention of the parties as set forth in the letter agreement. The third matter centered about a restrictive radius clause which was not specified in the letter agreement but was included in the landlord's standard form lease. This proposal would have restricted the opening of another restaurant by Greenjeans within 1,000 feet of the Park Avenue Atrium. Greenjeans sought its elimination and a right to assign the lease or to sublet based upon the view that, should its new venture prove successful, it

---

**12.** Mr. Kalen testified that he did not believe that the August 15 deadline constituted a full 30-day extension. There is no dispute, however, that the parties understood this date to be the revised effective expiration date. More-over, the Court finds that the ninety-day period as defined in the letter agreement and the thirty-day extension had in fact expired by August 15.

was entitled to capitalize thereon and to open another restaurant in proximity. O&Y on the other hand, since the rental was geared to a percentage of gross sales, sought to protect itself against a reduction of rent that would result by another restaurant close to the leased premises or by an assignment or sublease to a tenant who would generate less sales than Greenjeans. The three items as well as others were the subject of considerable discussion. Mr. Kalen advanced a proposal intended to dispose of these issues by amending the rent provision of the letter agreement to include a minimum rent schedule based on percentages of gross sales in case of an assignment. When this meeting adjourned, many issues were open and the parties agreed to meet again in Toronto on August 6.

### C. The August 6 Meeting

When they met on August 6, Mr. Reichmann, based upon the proposal advanced by Mr. Kalen at the prior meeting, presented alternative schedules of minimum base rentals. The meeting, which was scheduled to last two days, was terminated abruptly in less than two hours because of differences on the procedure to be adopted in considering the various provisions of the second draft and the objections raised by Ms. Stark's Memorandum. Ms. Stark and Mr. Kalen insisted that before negotiations continued that Mr. Polevoy respond seriatim in writing to each position and comment set forth in her Memorandum. Mr. Polevoy declined, contending that such a written response would unnecessarily prolong negotiations. He offered to discuss each lease provision, and if agreement were reached on particular points, then and there to draft appropriate language. It is a mild understatement to suggest that each lawyer had strongly felt views on how to negotiate, discuss and resolve the differences that were keeping the parties apart. Mr. Reichmann met with Mr. Kalen the next day and charged that Greenjeans was unwilling to go forward, which Mr. Kalen denied. However, they agreed to cooperate in an effort to compose their differences and to finalize a lease.

### D. The August 10 Meeting

The parties next met on Monday, August 10 in Toronto with Mr. Polevoy traveling there from New York notwithstanding a strike by Canadian air traffic controllers. They worked the better part of that day with all present feeling that substantial progress had been made, particularly with respect to the assignment and sublet, structural repair, and insurance clauses. However, a deterioration in their relationship soon displaced the prospect of agreement and execution of the required lease.

The August 10 meeting terminated at about 6 p. m. Ms. Stark agreed to call Mr. Polevoy the next day (Tuesday) in New York and to spend whatever time was required on the telephone in an effort to resolve open issues. Mr. Polevoy suggested in addition that she come to New York the following day, that is, Wednesday morning, August 12, if necessary. Ms. Stark did not telephone Mr. Polevoy on Tuesday and when he tried to reach her, was informed that she was unavailable. Late in the day, Ms. Stark's secretary called Mr. Polevoy to inform him that she would be unavailable the rest of that day and, further, that she would not come to New York on Wednesday, August 12, but would call him. However, she never did call on Wednesday. This state of affairs was communicated by Mr. Polevoy to Mr. Reichmann who, on August 12, caused a letter to be hand delivered to Mr. Kalen protesting Ms. Stark's failure to adhere to the arrangements, and charged that this and other events were "delaying tactics." This letter did not come to Mr. Kalen's attention until the following day, August 13. He communicated with Ms. Stark and instructed her to advise Mr. Polevoy that they were acting in good faith. She called Mr. Polevoy late that evening and they differ as to what was said about her failure to call as arranged; however, this conflict need not be resolved since it is immaterial with respect to the basic issues. In any event, she did request that discussions be resumed and Mr. Polevoy stated he did not know whether there was any longer a viable transaction and that he would have

to get instructions from his client. She immediately notified Mr. Kalen of what transpired. The next morning, August 14th, he and Mr. Reichmann conferred by phone several times, during which Mr. Kalen asked Mr. Reichmann where matters stood and the latter responded he did not know since Greenjeans had delayed matters for a week; he also stated that he understood the thirty-day extension would expire the next day on August 15 and that Kalen should do whatever he thought best. Mr. Kalen then said that if Mr. Reichmann did not extend the period, he would deliver a "signed document" to Mr. Reichmann's office. However, after that conversation and before leaving his office for the day, Mr. Reichmann instructed Mr. Polevoy to prepare a third draft embodying the points that had been agreed to up to that time. After hours, when Mr. Reichmann had already left his office for the day, Ms. Stark then hand delivered, together with a transmittal letter, signed copies of the second draft, as she phrased it, "identical with the redrafted Lease which I received from Stephen Collins at the beginning of July"—the one which had been the subject of discussion and negotiation at meetings on July 29, August 6 and 10, as referred to above.[13] Mr. Polevoy, unaware of the delivery of these documents to Mr. Reichmann's office, over the weekend prepared a third draft lease. Upon arrival at his office Monday morning, August 17, Mr. Reichmann found the signed copies of Mr. Collins' second draft. Mr. Reichmann thereupon decided to terminate the transaction and on the following day, O&Y notified Greenjeans that it was terminating the letter agreement for cause and in accordance with its terms.

■ Plaintiff contends that termination by defendants was improper and of no effect. It contends that it fulfilled the requirements of the letter agreement by executing the second draft. It is clear, however, that both the first and second drafts were not submitted to plaintiff for execu-

tion by it; they were not irrevocable options to be executed by Greenjeans at any time during the ninety-day period, as extended. Rather, the draft leases and Ms. Stark's Memorandum were part of the negotiation process with respect to the lease that was required under the letter agreement. Plaintiff knew that the second draft constituted proposals for consideration by the parties in an effort to reach agreement upon a lease to be executed by Greenjeans, and that it contained provisions to which there had been no accord. The second draft was unacceptable to the parties, as is undisputably established by the give and take negotiations with respect to these matters. The evidence leaves it beyond challenge that there was no meeting of the minds; that assent was lacking as to material terms. Plaintiff did not fulfill the requirement of executing a lease pursuant to paragraph 18 of the letter agreement. The second draft as executed did not contain mutually agreed upon amendments and in a number of respects, was inconsistent with the letter agreement. That the second draft was not an acceptable document to either party appears from a statement in Ms. Stark's transmittal letter of August 14: "The enclosed draft does not, however, accurately reflect the Letter Agreement executed by the parties on March 30, 1981, nor does it properly reflect what the Landlord has indicated in negotiations that it considers appropriate for the purposes of this transaction."

■ Plaintiff also contends that defendants did not have the right to terminate the agreement because they did not act "reasonably" and "expeditiously" as required by the letter agreement. The Court finds, however, that at all times O&Y's attorneys acted reasonably in seeking to reach amendments to the standard form lease; that O&Y and its representatives acted reasonably, expeditiously and in good faith in an endeavor to achieve agreement upon a lease document in accordance with the terms of the letter agreement; and that the failure

---

**13.** These copies were executed by Mr. Greenjeans Corporation, a Canadian corporation, and not by a New York corporation as required by the letter agreement.

to reach an accommodation within the extension period was not due to any act or acts on the part of O&Y; their attorneys or representatives. The record establishes that O&Y, in a spirit of cooperation, sought to meet the concern of Greenjeans with respect to various proposals or modifications. Perhaps the best demonstration of good faith is the fact that Mr. Reichmann, unaware that Ms. Stark had left at his office the executed second draft and notwithstanding his view that August 15 was the expiration date, had instructed Mr. Polevoy to prepare a third draft in an effort to conclude the matter.

Plaintiff having failed to execute a lease as required and within the period specified in the letter agreement, as extended, the defendants properly exercised their right to terminate the letter agreement pursuant to the provisions of paragraph 20.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.

Judgment may be entered accordingly.