Arnold L. Fein, J.
Metro-Goldwyn-Mayer, Inc. (MGM) sues Roy Scheider (Scheider), and Roy Scheider Productions, Inc. (Productions), for an injunction enjoining said defendants from entering into agreements which would require Scheider to perform services for any third party at a time when he is obligated to render services to plaintiff, and enjoining Scheider from rendering services to any third party at a time when he is obligated to render services to plaintiff, and for damages for Scheider’s refusal to render services to plaintiff.
MGM is a film producer, under agreement with American Broadcasting Company (ABC), pursuant to which MGM has produced a pilot film entitled “ Munich Project ”. A pilot film is a picture produced for a television network as a demonstration picture with the hope that the network will order a television series based upon the pilot film. During the pendency of this action, ABC has exercised its option, requiring MGM to produce and deliver to ABC a television series based upon the pilot film, for broadcast on the ABC network, beginning in September, 1972. On Sunday, April 30,1972, during the course of the trial, ABC showed the pilot film on its TV stations.
On September 30, 1971, after meetings and telephone conver7 sations among MGM and ABC representatives, Scheider, and Scheider’s agent Joan Scott (Scott), it was agreed: (1) Scheider would appear in and be paid $20,000 for making the pilot film; (2) Scheider would be paid, per episode, for his services in any TV series that might result from the pilot: first year, $5,000 per episode; second year, $6,000 per episode; third year, $7,000 per episode; fourth year, $9,500 per episode; fifth year, $11,500 per episode; (3) if the pilot film resulted in a television series, MGM would have a one-year option from the date of completion of the pilot for Scheider’s services for such series.
Left unresolved in these conversations was Scheider’s billing. At that time Scheider was a relatively unknown actor, who had *420 played a major role in a then unreleased picture, “ The French Connection ’ ’ for which he has since gained acclaim and a nomination for an academy award as best supporting actor. A preview of that film had been seen by ABC and MGM personnel at that time. Within a few days, it was agreed that Scheider would have second star billing in the pilot and first star hilling in the series, should there be a series. These understandings were not reduced to writing, it being agreed that further terms would be wofked out between Scheider’s attorney and the attorneys for MGM.
On this basis, on or about October 6,1971, Scheider proceeded to Munich, Germany, where, over a six weeks’ period, the pilot was filmed. Between that time and up to on or about February 17, 1972, there were negotiations between Scheider’s attorney and the attorneys for MGM. On or about February 15, 1972, MGM’s attorneys and Scheider’s' attorney had agreed on all hut one of the terms of the proposed agreement in substance, although the language of some agreed upon provisions remained to he drafted. There was disagreement as to the starting date, the date on which Scheider would he required to report to start filming the series. In the conversations between Scott and the .MGM representatives, no starting date had been discussed or fixed and at the beginning of the negotiations there was no such discussion. Sometime in late October or early November, 1971, in a telephone conversation between Frederick C. Houghton (Houghton), MGM’s attorney, and Daniel Kossow (Kossow), Scheider’s attorney, the question of a starting date was first raised.
Kossow pointed out that MGM’s one-year option on Scheider’s services might interfere with or prevent Scheider’s acceptance of other performing assignments for 12 months. Houghton testified that he told Kossow that, if ABC did not exercise its option for a September, 1972 air date, MGM would not require Scheider to report for filming until November 1, 1972.
Kossow testified that he understood Houghton to say that November 1, 1972, was “ an outside date before which Mr. Scheider would not be required to render services.” Kossow testified that on this basis he told Houghton, “ he had a deal ”, and that he so advised Scheider some time later. However, it is conceded that in subsequent conversations and correspondence with Houghton during the negotiations there was reference to earlier start dates, so that Scheider would have an opportunity to do other work without jeopardizing MGM’s network delivery schedule, should ABC exercise its option for a Sep *421 tember, 1972 air date. All parties understood that if ABC exercised its option for a September, 1972 air date for the series, filming would have to begin in the spring of 1972. There were similar discussions between Kossow and Thomas J. Robinson (Robinson), another MGM attorney. In these various conversations and communications, the dates discussed were April and May, 1972 dates, and also June 5,1972.
. It is the custom and practice of the industry that when a pilot is filmed in the fall of the year and shown to the network during the winter, the ¡network has the option for a series to be shown beginning in September of the following year. In such event, filming of the series by the producer must begin in the spring, April or May, or at the latest, early June. If the network determines to show the series beginning in January or February of the next year, a so-called midyear showing, filming of the series takes place in the late fall. It is also the custom and practice that the producing company’s option entitles it to require the principal actors in the pilot to perform in the series, consistent with the network’s option to require the producer to produce and deliver a TV series based upon the pilot.
It is undisputed that all of the parties were aware of these customs and practices, and that the ABC-MGM agreement was consistent therewith.
On or about February 17, 1972, Kossow advised MGM that, since MGM had refused to agree to a November 1,1972 starting date for Scheider, Scheider would not perform in the series and considered that he had no further obligation to MGM, either to negotiate or perform. No written contract was ever executed.
ABO has exercised its option calling upon MGM to produce a series of eight episodes for air dates commencing September, 1972. MGM has exercised its option requiring Scheider to report on or before June 5, 1972, for filming the series. Scheider has stated that he will not do so.
• At issue is whether the terms agreed upon were sufficient to support a finding that the parties made an agreement enforceable under the Statute of Frauds or otherwise.
Whether the terms agreed between Scott and MGM were sufficient to establish a contract, is not free from doubt. There was much testimony on both sides as to the custom and practice of the industry to enter into binding oral arrangements on the basic or essential terms under which a performer will render services in making a pilot film, and for negotiation of a formal contract to continue during the period the actor is performing. There was also testimony as to the custom and practice of embodying *422 such terms in a written “ Outline Deal Memo ”, utilized with respect to Richard Basehart, the other principal actor in the pilot.
There was disagreement as to what terms are considered basic or essential.
It is undisputed that many of the matters left for negotiation, such as residual rights, commercial fees, etc., would substantially affect Scheider’s compensation. Moreover, there was never any specific agreement as to a starting date for Scheider’s performance, although implicit in MGM’s one-year option was the right to exercise the option within the year.
Although plaintiff did not prove that Scheider and his representatives ever agreed on a particular starting date, the record establishes that Scheider and his representatives knew that if ABC exercised its option for a September, 1972 air date, MGM would be compelled to require Scheider to report for filming in the spring or early summer of 1972. Scheider knew that the MGM optipn gave it authority to require such a starting date.
It is manifest that many of the essential or basic elements of the contemplated contract were left for future negotiation at the time of the original understanding. Irrespective of any custom or practice of an industry, there is no contract if material financial or time elements involving compensation or other kinds of payment or duration are left undetermined (Willmott v. Giarraputo, 5 N Y 2d 250; Ansorge v. Kane, 244 N. Y. 395). The court cannot write a contract which the parties have not made (Kusky v. Berger, 33 Misc 2d 564, affd. 20 A D 2d 851).
However, where the parties have completed their negotiations of what they regard as essential elements, and performance has begun on the good faith understanding that agreement on the unsettled matters will follow, the court will find and enforce a contract even though the parties have expressly left these other elements for future negotiation and agreement, if some objective method of determination is available, independent of either party’s mere wish or desire. Such objective criteria may be found in the agreement itself, commercial practice or other usage and custom. If the contract can be rendered certain and complete, by reference to something certain, the court will fill in the gaps (May Metropolitan Corp. v. May Oil Burner Corp., 290 N. Y. 260; Cohen & Sons v. Lurie Woolen Co., 232 N. Y. 112; Varney v. Ditmars, 217 N. Y. 223).
Here, the subsequent agreement of the parties as to all the elements of the contract, except the starting date, provides a basis for finding a complete contract. Although there was no *423 agreement on a start date, this missing element is not dispositive. Implicit in Scheider’s agreement to make the pilot and do the series, subject to MGM’s one-year option, was a promise to report in time for the filming of the series, in the event ABO picked up the picture for a series with a September, 1972 start. Scheider’s agreement was 16 ‘instinct with an obligation ’ ” so to report. (Wood v. Duff-Gordon, 222 N. Y. 88, 91, quoting McCall Co. v. Wright, 133 App. Div. 62.) Enough has been shown as to the custom and practice of the industry, the understanding of the parties, and their subsequent agreement as to terms, to establish a contract requiring Scheider to report during the spring of 1972 for a September, 1972 air date, if so requested by MGM. This is a reasonable time, which may be implied by law, even if not agreed upon. (Cohen & Sons v. Lurie Woolen Co., 232 N. Y. 112, supra.)
However, this is not dispositive. There remains the issue whether the agreement as here found is unenforceable because of the Statute of Frauds.
Section 5-701 of the General Obligations Law provides:
“Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by Ms lawful agent, if such agreement, promise or undertaking:
“ 1. By its terms is not to be performed within one year from the making thereof
A contract, otherwise within the Statute of Frauds because not performable within a year, may be taken out of the operation of the statute if both parties have an option to terminate it wdtMn the year. (Blake v. Voigt, 134 N. Y. 69.) Although there is conflict in the cases as to whether an option on one side to terminate within the year avoids the statute, reason and authority compel the conclusion that if the option is exercisable only by the party seeMng to enforce the agreement, such option does not take the case out of the statute. (Belfert v. People's Planning Corp. of Amer., 22 Misc 2d 753, affd. 11 A D 2d 760, affd. 11 N Y 2d 755; Kastner v. Gover, 19 A D 2d 480; Harris v. Home Ind. Co., 6 A D 2d 861.)
Here, Scheider had no option. The option was solely with MGM. Although such option would be exercised by MGM only if ABC first exercised its option to require MGM to produce the series, nonetheless Scheider would have to keep himself at the disposal of MGM for one year after the filming of the pilot wMeh was concluded some time in November of 1971. The contract upon wMch the plaintiff relies was made on or about Septexn *424 her SO, 1971. Hence, MGM could exercise its option within a period of some 14 months after the making of the contract. This being the case, Scheider was bound, if bound at all, for a period of 14 months. It is immaterial that MGM offered to agree that if ABC did not exercise its option within the first six months, Scheider’s starting date would be November 1,1972, or later, or would be subject to his other engagements. None of these alternatives were within his control. Nor is it an answer to say, as does MGM, that the exercise of the option was not the uncontrolled voluntary act of MGM, but was subject to. ABC’s exercise of its option. As to Scheider, it is “ illusory ” to consider that this made ‘1 the contract terminable or performable within one year. And it is to the party to be charged, alone, namely the defendant, that the statute is designed to provide protection from fraud and perjury. ’ ’ (Harris v. Home Ind. Co.; 6 A D 2d 861, supra.)
MGM’s reliance on Manufacturing Specialties Co. v. Friedman & Sons (29 A D 2d 859), Mar-Bond Beverage Corp. v. Dublin Distrs. (9 A D 2d 951), and Lenz v. World-Wide Automobiles Corp. (9 Misc 2d 32, affd. 5 A D 2d 1051) is misplaced. As the Appellate Division indicated in Manufacturing Specialties Co. (supra), holding the statute inapplicable, these are distributorship cases in which the licensor or supplier expressly conditioned the duration of the contract upon the continuance of its license or source of supply, terminable by others not within either party’s control, which might occur within a year. This was not only within the contemplation of both parties, it also provided for termination within the year, not for the exercise of rights beyond one year.
Here Scheider was at MGM’s option for more than a year, albeit subject to the ABO option, also extending for more than one year after making of the Scheider-MGM agreement. Under these circumstances, the contract is unenforceable as against Scheider, because not embodied in a writing signed by him, as required by the statute.
Nor is Scheider estopped to plead the statute. Although it has been held that the statute may not be used to' perpetrate a fraud, the cases so holding turn on a finding that the party seeking to plead the statute deliberately acted in such a manner as to cause the other party seriously and irremediably to change Ms position to his substantial damage. (Walter v. Hoffman, 267 N. Y. 365; Merchant’s Line v. Baltimore & Ohio R. R. Co., 222 N. Y. 344; Dunscombe v. Crocker-Wheeler Elec. Mfg. Co., 232 App. Div. 137.) There is no such showing here. The pilot film *425 is a complete entity in and of itself. It has been shown. The record establishes that such films are nseable and do produce income and that this one apparently has. It has not been demonstrated that Scheider could compel MGrM to use his services, if it chose not to do so, nor that MGrM could not make the series with another actor. Nor has it been established that Scheider willfully entered into the original understanding or carried on the negotiations with any intention to perpetrate a fraud upon plaintiff. The fact that he has since gained acclaim for his role in “ The French Connection ” does not demonstrate that he has failed to act in good faith, as claimed by MGrM. His greater value because of that role was undoubtedly a factor in the minds of both parties during the negotiations. This is not determinative. Plaintiff has not proved the existence of an enforceable contract.
The defendant has failed to prove his counterclaim or to establish any damages. His claim for punitive damages is without merit.
Accordingly, the complaint and counterclaim are both dismissed.