CAMREX CONTRACTORS (MARINE)
LIMITED, Plaintiff,

v.

RELIANCE MARINE APPLICATORS,
INC.; Camrex Reliance Paint Compa-
ny, Inc., Jerry C. Arger; Andrew A.
Argiriadi; James Mardikos; and An-
thony Saleh, Defendants.

No. 79 CV 2381 (ERN).

United States District Court,
E.D. New York.

Feb. 3, 1984.

Healy & Baillie by Glen T. Oxton, Richard V. Singleton, New York City, for plaintiff.

Hopgood, Calimafde, Kalil, Blaustein & Judlowe by Nicholas John Stathis, James J. Foster, New York City, for defendants Reliance Marine, Camrex Reliance, Arger and Argiriadi.

Israelson, Manning & Raab by William J. Dealy and Taggart & Colucci by Frank J. Colucci, Susan Progoff, New York City, for defendants Mardikos and Saleh.

## MEMORANDUM OF DECISION AND ORDER

NEAHER, District Judge.

Plaintiff brought this action involving a dispute in the overhaul of two ships under the Court's admiralty and maritime jurisdiction. 28 U.S.C. § 1333; Fed.R.Civ.Pro. 9(h). After conferring with the parties, the Court bifurcated the proceedings. The first stage would determine whether a contract exists and, if so, its terms. The second stage would resolve recovery questions.

At a non-jury trial plaintiff presented its evidence on the first stage issues. Based on that evidence, the Court now holds that a contract was formed by the October 27–30, 1978 telexes, as modified by the November 10, 1978 telexes. The terms are those explicitly agreed to within the confines of those telex exchanges and the agreement continues to exist. The facts and discussion which follow constitute the Court's findings of fact and conclusions of law. Rule 52(a), Fed.R.Civ.Pro.

## I. FACTS

Plaintiff Camrex Contractors (Marine) Limited ("CCML") is the wholly-owned subsidiary of Camrex (Holdings) Limited ("Camrex"), an English holding company.[1] Also located in England, CCML is a marine contractor engaged in the grit blasting and coating of ships' surfaces. During the relevant period, Peter Dillon and Alan Miller were on Camrex's main board of directors.

In July 1978, Keith Pagnam was named CCML's managing director. Anthony Saleh, a CCML director then and a defendant now, was passed over for that position and, thereafter, answered to Pagnam. Robert Antliff, CCML's marine manager, in turn, reported to Saleh.

Besides Saleh, the defendants are two New York corporations, Camrex Reliance

---

1. At the Court's request, the parties submitted proposed findings. Most facts are not disputed, while many inferences are, of course. In any event, given the general factual agreement, the Court will only cite to specific evidence when necessary to resolve a conflict, clarify a refer- ence or the like. When so doing, the Court will use the following abbreviations: Tr. (Trial Transcript), PX (Plaintiff Exhibit), Dep. (Deposition), and PPF or DPF (Plaintiff or Defendant Proposed Findings).

Paint Co., Inc. and Reliance Marine Applicators, Inc., and three individuals, Jerry Arger, Andrew Argiriadi and James Mardikos.[2] Camrex Reliance Paint Co., Inc. ("Camrex Reliance"), which supplies ships' paint requirements, was acquired in 1974 (under a different name) by Arger, Argiriadi and Mardikos ("the partners"). In 1977, Camrex purchased 40% of Camrex Reliance's stock (hence, the name change) and two Camrex main board members, Dillon and Miller, joined the three partners to form Camrex Reliance's five-person board, with the stipulation that four directors must agree before any action was taken. Subsequently, another corporation, Reliance Marine Applicators, Inc. ("Applicators"), was founded in August 1978 by Whale Chemical Co., Inc., which also was owned by the partners.[3]

After the stock was acquired, CCML assisted Camrex Reliance in bidding for projects and in managing the work following successful bids. In furtherance of these joint undertakings, Saleh made several trips from England to New York beginning in 1978. In July of that year, a bid was accepted from Coastal Dry Dock and Repair Corp. ("Coastal"), a shipyard owning company in New York, to grit blast and coat the U.S.S. Butte. Besides managerial assistance on that project, CCML provided labor and equipment at a per square footage price.

After Pagnam's appointment, Saleh made several trips to New York. In mid-August, Saleh informed Pagnam, Antliff and others that he was going to secure a major contract for CCML's American "sister company", Camrex Reliance. CCML would provide the men and equipment, while Camrex Reliance would provide the

materials. Due to a recession in the European maritime industry, CCML had been desirous of working across the Atlantic and its management (Pagnam, et al.) were delighted with the good news. In anticipation of landing the contract, Saleh began mobilizing men and equipment. He did not, however, seek project approval from Camrex's main board (Dillon, et al.), thereby possibly violating corporate procedure.

The hoped for venture emanated from the U.S. Navy. In late summer 1978, Coastal, the prime contractor, had received job orders to overhaul the U.S.S. Caloosahatchee and the U.S.S. Kalamazoo. In mid-September, the partners submitted the first of several proposals to Coastal for the grit blasting and coating subcontract. On October 13, Coastal issued purchase orders totaling $1,800,000 for the two ships to Applicators ("c/o Camrex Reliance"). PX 47 and 48. Jerry Arger signed his acceptance on Applicators' behalf.

On October 20, Saleh resigned from CCML and accepted a position with Applicators, for whom he began work in January 1979. Despite that resignation, Saleh remained with CCML until mid-December 1978.

Antliff, at Saleh's direction, prepared a square footage quotation for the ships. On October 27, 1978, using Saleh's calculations, Antliff sent a quotation by telex to Camrex Reliance for $1.47 per square foot. The telex also listed services to be included and excluded (the rights and obligations of the contracting parties). PX 59. Immediately answering, Arger sought $1.46 and responded as well to other aspects of the proposal. He closed by stating:

---

**2.** The defendants have divided into two groups, with Arger, Argiriadi, Camrex Reliance Paint Co., Inc. and Reliance Marine Applicators, Inc. in one, and Saleh and Mardikos in the other. Each group has submitted proposed findings, which vary on certain important issues but not significantly otherwise. Thus, for brevity, the defendants will be referred to in the aggregate, unless their positions must be distinguished. When that is required, Arger and Saleh will represent their respective groups, e.g., Arger DPF.

**3.** Given the interrelationship among Camrex Reliance, Applicators and the partners, the Court will refer to Camrex Reliance when meaning the defendants generally (excluding Saleh), unless greater precision is warranted, e.g., when referring particularly to Arger, Argiriadi and Mardikos, the term "partners" will be used. Camrex Reliance's designation is also consistent with the Court's determination that the contract was between Camrex Reliance and CCML. See p. 1430 infra.

ALL WORK TO BE DONE IN AC-CORDANCE TO SHIPS SPECIFICA-TIONS, AND CONTROL AND RE-SPONSIBILITY OF THE JOB IS AS-SUMED BY YOURSELVES.

REGARDS

JERRY ARGER

CAMREX RELIANCE

PX 60.

Still on October 27, CCML wired back agreeing to $1.46 for the Kalamazoo but asking $1.47 for the Caloosahatchee *and* $1.37 for new areas, adding:

WE HAVE RECORDED THE OTHER ITEMS MENTIONED AND AGREE WITH YOUR PROPOSALS.

PX 61.

Arger's answer was not forthcoming; and on October 30, Antliff requested confirmation, while raising other matters (contract cancellation charges, CCML's contact with shipyard management, etc.). PX 62. Arger responded the same day without disclosing that the Coastal contract was with Applicators, not with Camrex Reliance, and stating

WITH ... REFERENCE TO OUR TE-LEX OF OCTOBER 27, AND YOUR RE-PLY OF OCTOBER 27, 1978 YOUR REFERENCE ... REGARDING ... THE CALOOSAHATCHEE AND KALA-MAZOO PLEASE NOTE THAT *WE AC-CEPT YOUR OFFER* AS NOTED IN OUR TWO AFOREMENTIONED TE-LEXES. HOWEVER REGARDING YOUR REQUEST OF 1.37 USDLRS ON NEW BUILDING AND OR EXTRA AR-EAS WE RESERVE THE RIGHT TO DISCUSS SAME WITH YOU TO A MU-TUAL SATISFACTORY AGREEMENT WHEN YOU VISIT US THIS WEEK.

PX 63 (emphasis added).[4]

About this time, CCML employees in New York remeasured the ships' square footage and discovered that, rather than 674,000 as previously estimated, the total was between 800,000 and 900,000 square feet.

On November 3, using both English and American labor as well as much of its own equipment, CCML started work on the Caloosahatchee. Two days later, CCML (Antliff and Saleh) and Camrex Reliance (the partners) had a meeting. Arger announced that the contract was being changed and that the offer was now $1,000,000 lump sum for both ships or, alternatively, the hiring of CCML's men and equipment on a daily basis. The new proposal was prompted by the square footage remeasurement and the attendant realization that the partners' Coastal contract, itself a lump sum agreement, was underpriced. Arger gave CCML forty-eight hours to decide.

Receiving word in England, Pagnam was strongly adverse, believing that the October 27–30 telex exchange constituted a contract and, moreover, that a change was unacceptable. He sent a telex reflecting his beliefs.

Pagnam also summoned Saleh and Antliff from New York. Prior to leaving, they had "costed" the $1,000,000 proposal, determined it commercially viable and communicated that assessment to Pagnam.[5] Tr. at 166–67. During their return, Saleh and Antliff discussed the situation. According to Antliff's testimony, Saleh mentioned that Camrex Reliance would get

4. Although prompted by CCML's October 30 telex, Arger's response did not address the other matters raised in it (contract cancellation costs, CCML's contact with shipyard management, etc.).

5. As stated, Saleh and Antliff viewed the proposal as commercially viable. But Pagnam, who received their recommendation and ultimately made the decision to accept the modification, has testified inconsistently on this point. During his deposition, he at first said that, "I knew there was going to be a loss." PX 115, at 93 (Pagnam's Dep.). But later he testified that the contract would result in a 20% return "that would ... give us a recovery on overheads ... but wouldn't give us any net profit." *Id.* at 152. He also remarked that since CCML was "already committed to the contract" that return was "the best that we could probably get out of it." *Id.*

The later testimony better reflects the assessment that Pagnam received from Saleh and Antliff. Therefore, the Court finds that while not perceiving the proposal as a profitmaker, Pagnam did view it as commercially viable under the circumstances.

$1,400,000 from Coastal (a sum varying from the purchase orders' $1,800,000), and that Camrex Reliance would be responsible for taxes and insurance costs on local labor, which ran about .62 per wage dollar.[6] Tr. at 168.

In the meantime, Pagnam consulted English counsel, who advised that the October telexes were *not* a contract. After returning, Antliff did not inform Pagnam about Saleh's statements concerning the Coastal price and Camrex Reliance's responsibility for the local labor costs. Even without that information, Pagnam still directed Antliff to accept the $1,000,000 offer.

Reportedly, Pagnam was under substantial pressure when he made this decision. Arger had threatened to impound CCML's equipment and to sue. Also, withdrawing from the project would have been financially costly and could have been damaging to CCML's world-wide reputation. Lastly, Pagnam had to decide quickly.

Acting on Pagnam's instruction, Antliff wired the acceptance:

*RE: CONTRACT* FOR VESSELS USS CALOOSAHATCHEE AND USS KALAMAZOO

*WE ACCEPT RELIANCE INC'S OFFER* OF DOLLARS 1,000,000 FOR ... 830,000 FT2 ....

WORK HAVING COMMENCED ON THESE CONTRACTS FRIDAY 3RD NOVEMBER 1978 STAGE PAYMENTS WILL BE AS AGREEMENT REACHED AFTER DISCUSSIONS 8TH NOVEMBER 1978, WHICH ARE AS FOLLOWS: [STAGE PAYMENT SCHEDULE DETAILED]

**6.** At trial, Arger's counsel objected to Antliff's testimony on hearsay grounds. However, Antliff twice subsequently gave the same testimony without objection after CCML's counsel had voluntarily withdrawn it. Hence the objection is too late.

> An objection must be timely. *"[I]t must be made as soon as the applicability of it is known ... to the opponent,* unless some special rule makes a postponement desirable ... and not unfair to the proponent ...."

WILL YOU PLEASE REVERT BY RETURN YOUR OFFICIAL ACCEPTANCE ....
WE WILL FOLLOW WITH OFFICIAL LETTER CONFIRMING THE ABOVE.
PX 70 (emphasis added).

Arger answered the same day:
*REFERENCE CONTRACT* FOR USS CALOOSAHATCHEE AND USS KALAMAZOO AND YOUR RECENT OFFER ... *WE ACCEPT*

.    .    .    .    .

JERRY ARGER OF CAMREX RELIANCE NEW YORK

PX 71 (emphasis added).

On November 20, CCML sent a comprehensive letter confirming the quotations. PX 72. Although containing essentially the same inclusions and exclusions enumerated in CCML's initial October 27 telex (PX 59), the November 20 letter notably listed heat and "local labor insurances" as items excluded from CCML's responsibility.

During this period, Camrex main board member Dillon first learned of the project. Concerned that corporate procedures had been breached because the contract had not been approved by the main board, Dillon directed Pagnam to marshal the facts. Having received no response to the November 20 letter by early December, Pagnam detailed Antliff to New York where he met with the partners. Little was clarified because, according to Antliff, Arger refused to even discuss the November 20 letter.

A follow-up letter drew no acknowledgment. Argiriadi and Antliff, however, did speak by telephone on January 4, 1979, at which time Argiriadi disclosed that the contract had been changed from Camrex Reliance to Applicators. The next day, Ant-

1 Weinstein & Berger, *Weinstein's Evidence* at 103–16 (1982) (*quoting* 1 Wigmore, *Evidence* § 18, at 323 (3rd ed. 1940)) (emphasis by Wigmore; footnotes omitted). *See also* Cleary, *McCormick on Evidence* "Objections", at 118 (2d ed. 1972) ("A offers testimony ... which his adversary, B, thinks is incompetent. [B's] ... objection is *sustained.* [I]f A offers similar testimony ..., B must ... repeat his objection ....") (emphasis in original).

liff sent a telex containing a letter from CCML's English counsel regarding overdue payments on the Caloosahatchee (as well as the Butte):

*OUR CLIENTS TELEXED YOU WITH THE MAIN POINTS OF THE CONTRACT ON THE 10TH NOVEMBER ...* AND WE HAVE YOUR TELEX AC-CEPTANCE .... THE CONTRACT DE-TAILS WERE THEN SET OUT IN OUR CLIENTS' LETTER OF THE 20TH NO-VEMBER .... [I]N SPITE OF RE-PEATED REQUESTS OUR CLIENTS HAVE RECEIVED NO WRITTEN CON-FIRMATION .... *THEY HAVE HOW-EVER PARTLY PERFORMED THE CONTRACT* .... [T]HEY HAVE RE-CEIVED NO PAYMENTS .... [U]NLESS BY THE 13TH ...

A) THEY HAVE WRITTEN CONFIR-MATION & ORDERS ... AND

B) ... ALL INTERIM PAYMENTS ... HAVE BEEN MET ...

THEY WILL FEEL COMPELLED TO WITHDRAW ALL LABOUR, EQUIP-MENT AND MATERIALS ... AND TO COMMENCE PROCEEDINGS ... *FOR BREACH OF CONTRACT.*

PX 89 (emphasis added). That telex was probably meant to be a response-inducing measure, which failed, nonetheless, because no acknowledgment was received.

An unproductive meeting was held on January 13, 1979. Yet another took place on February 15 with Camrex main board members Dillon and Miller present. Recounting that meeting, Dillon testified that he objected to Applicators' substitution and reserved his rights on it. Despite continuing disputes over expenses, the project was eventually finished. A last unsuccessful meeting was held on June 7, 1979.

## II. ANALYSIS

Roughly grouped, CCML has five alternative theories.[7] First, the October-No-vember 1978 telexes did not result in a contract. Specifically, Camrex Reliance's acceptance in the October telex exchange was materially variant from CCML's offer, thereby converting Camrex Reliance's acceptance into a counter-offer. If, however, a contract did briefly arise, CCML contends that Camrex Reliance quickly repudiated it when the true square footage was ascertained. Nor did the November 10 exchange constitute a contract because any agreement was vague with open, essential terms.

Second, if a contract was formed, it was the result of fraudulent inducement. Third, if not fraudulent inducement, then the contract (that is, the November change) was forged by economic coercion. Fourth, if none of the above, CCML argues that the contract was decisively repudiated in January 1979 by forcing Applicators' substitution.

Under the preceding theories, CCML requests recovery in quantum meruit for services rendered. If a contract somehow survived that legal gauntlet, CCML's fifth theory seeks recovery pursuant to the agreement's terms.

Defendants' position can be more succinctly summarized. The October-November 1978 telexes resulted in a contract for 830,000 square feet and $1,000,000. The parties' rights and obligations are set out in the initial CCML October 27 telex (PX 59), except as explicitly modified by the subsequent telexes through November 10. That bargain continues because it was neither fraudulently induced, economically coerced nor effectively repudiated.

Based on that position and the evidence adduced, defendants moved after plaintiff's case-in-chief to dismiss the "no contract" causes of action, a motion cognizable under Fed.R.Civ.Pro. 41(b).

---

7. CCML's legal position has shifted during this litigation to the extent that the amended complaint's causes of action and the present recovery theories, while not inconsistent, do not mirror one another. Notwithstanding, the Court has grouped those causes of action and recovery theories to reflect CCML's discernible present position. In so doing, the Court has dispensed with CCML's second cause of action for unjust enrichment. Since a contract has been found to exist and recovery will be pursuant to its terms, a discussion of unjust enrichment recovery premised on the absence of a contract would be pointless.

Fed.R.Civ.P. 41(b) provides that a defendant in a case tried to the Court may move for dismissal at the close of the plaintiff's evidence on the ground that ... the plaintiff has shown no right to relief. In rendering judgment the Court is not to make any special inferences. [Citations omitted.] Rather, the Court is to 'weigh. the evidence ... and decide for itself where the preponderance lies.'

*Bertolino v. Italian Line,* 414 F.Supp. 279, 284 (S.D.N.Y.1976) (*quoting* Wright & Miller, *Federal Practice & Procedure* "Civil" § 2371, at 225 (1971)).

Necessarily then, plaintiff must carry its full burden to withstand defendants' motion to dismiss the "no contract" causes of action.

## A. *The Absence of an Express Contract Theory*

### 1. *Intention to Reach a Binding Agreement*

■ When confronted with contract formation issues, New York courts apply an objective test.[8]

What is looked to ... is not the parties' after-the-fact professed subjective intent, but their objective intent as manifested by their expressed words and deeds at the time. [Citation omitted.] In determining whether the parties entered into a contractual agreement and what were its terms,

> "disproportionate emphasis is not to be put on any single act, phrase, or other expression, but, instead, on the totality of all of these, given the attendant circumstances, the situation of the parties, and [their] objectives ...."

*Reprosystem, B.V. v. SCM Corp.,* 522 F.Supp. 1257, 1275 (S.D.N.Y.1981) (*quoting Brown Bros. Electrical Contractors, Inc. v. Beam Construction Corp.,* 41 N.Y.2d

397, 393 N.Y.S.2d 350, 352, 361 N.E.2d 999, 1001 (1977)).

■ Notwithstanding CCML's arguments, the parties through preparation, bargaining and work commencement objectively demonstrated that "they intended to reach a binding agreement." *Id.* In other words, their total interaction manifested a mutual assent to form a contract. *See* 21 *N.Y.Jur.2d* "Contracts", at 443 (1982) ("The manifestation ... of assent necessary to form a contract may be by word, act, or conduct which evinces the intention of the parties to contract.").

Anticipating this major contract, CCML prepared for mobilization in late summer 1978. Across the Atlantic, the partners began submitting bids to Coastal in mid-September and procured the contract in mid-October. Serious bargaining between CCML and Camrex Reliance followed, with each side concentrating on essential terms.

Those negotiations, in particular, underscored the mutual assent to contract.

> The manifestation of mutual assent to an exchange ordinarily takes the form of an offer ... by one party followed by an acceptance by the other ....

*Restatement (Second) of Contracts* § 22(1), at 66 (1981). CCML's first October 27 telex was a "proposed quotation" for 250,000 square feet on the Caloosahatchee at $1.47 per square foot with 42 days estimated completion time. PX 59. That same dollar rate would apply to the Kalamazoo's 424,000 square feet on a 70-day schedule. Extra work would be at $1.47 per square foot. Specific price inclusions (*e.g.,* touch-up work) and exclusions (*e.g.,* forklifts) were detailed.

Plainly, CCML had made an offer.

> [A]n offer [is] "the manifestation of willingness to enter into a bargain, so made as to justify another ... in under-

---

**8.** Each side has cited New York caselaw; thus, choice of law appears undisputed. Notwithstanding, as the place of performance, face-to-face negotiations and subject matter (the ships), New York has the most significant relationship to this action and, therefore, its law is controlling. *See G.A. Thompson & Co. v. Wendell J. Miller Mortgage Co.,* 457 F.Supp. 996, 998 n. 2

(S.D.N.Y.1978) ("In a contract action ... the applicable law will be ... the state which has the most significant relationship to the transaction and the parties."). *See also Restatement (Second) of Conflict of Laws* § 188, at 573 (1971) (listing factors for a most significant relationship determination).

standing that his assent to that bargain is invited and will conclude it."

*V'Soske v. Barwick*, 404 F.2d 495, 499 (2d Cir.1968), *cert. denied*, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969) (*quoting Restatement (Second) of Contracts* § 24 ([then] Tent.Draft No. 1, 1964). By its specificity (prices, areas, schedules, inclusions-exclusions, etc.) and timing (after the partners had secured the Coastal contract), CCML's telex could "hardly be construed otherwise than as extending ... the power of acceptance." *Id.*

Although its assent was invited, Camrex Reliance counteroffered $1.46 with a lesser amount for the extra work. Camrex Reliance also added that the work was to be performed according to "SHIPS SPECIFICATIONS" with the job responsibility assumed by CCML. PX 60. As a counteroffer, Camrex Reliance's October 27 telex proposed "a substituted bargain." *Restatement (Second) of Contracts* § 39, at 106 (1981). As such, it was "capable of being accepted" and "carrie[d] negotiations on." *Id.* Comment a. That counteroffer illustrated Camrex Reliance's continued desire to consummate a contract.

Quickly answering, CCML sought $1.47 for the Caloosahatchee, $1.46 for the Kalamazoo and $1.37 for any new areas. All else was agreed. PX 61.

The hard bargaining had ended; Camrex Reliance's final acceptance was awaited.

Acceptance of an offer is a manifestation of assent to the terms thereof made ... in a manner invited ... by the offer. *Restatement (Second) of Contracts* § 50, at 128 (1981).

Since no immediate response was forthcoming, CCML sent an October 30 telex soliciting that final acceptance. Arger promptly gave it ("WE ACCEPT YOUR OFFER") but reserved on the extra work price.[9] PX 63. CCML commenced work four days later, thereby exhibiting a satisfaction in Camrex Reliance's acceptance and, concomitantly, a belief in the contract's existence.

In sum, from preparation to performance, the continuum of "expressions and conduct" displayed CCML's and Camrex Reliance's committed mutual "inten[tions] to reach a binding agreement." *Reprosystem, B.V. v. SCM Corp., supra*, 522 F.Supp. at 1275. The next question is whether the agreement sought was formed.

### 2. *Offer and Acceptance*

[5] Irrespective of intent, CCML asserts that Camrex Reliance's purported acceptance on October 30 materially differed from the outstanding offer and, consequently, no contract was formed. *See, e.g.*, 17 *Am.Jur.* "Contracts" § 62, at 460 (1964) ("[A]n acceptance must comply with ... the offer ... and there must be no ... material variance between them."). CCML pointedly calls attention to Camrex Reliance's reserving discussion on the extra areas.[10] PX 63.

While offer and acceptance, of course, must conform, "it is also plain that all the terms contemplated ... need not be fixed with complete ... certainty for a contract to have legal efficacy." *V'Soske v. Barwick, supra*, 404 F.2d at 500 (informal correspondence for business purchase resulted in an enforceable contract despite later dispute over "audited net worth" term and later negotiations to add new terms). *See also Reprosystem, B.V. v. SCM Corp., supra*, 522 F.Supp. at 1275 (in

9. As discussed *infra* at pp. 1427–1429, reserving on that term did not evince an intention not to be bound.

10. CCML also marks the "excluding" of its October 30 telex's additional terms (contract cancellation costs, CCML's contact with shipyard management, etc.) from Camrex Reliance's acceptance. PPF ¶ 41, at 14. An equally reasonable inference is that, since CCML's October 30 telex spurred his response, Arger's failure to address

the additional terms may have been an oversight. Regardless, by beginning performance four days later, CCML indicated that those terms were nonessential and could be negotiated thereafter, if necessary. *See, e.g., Metro-Goldwyn-Mayer, Inc. v. Scheider*, 75 Misc.2d 418, 347 N.Y.S.2d 755, 761 (Sup.Ct.1972), *aff'd*, 40 N.Y.2d 1069, 392 N.Y.S.2d 252, 360 N.E.2d 930 (1976) (*per curiam*) (discussed *infra* at pp. 1428–1429).

deciding that unsigned "Final Drafts" with open terms resulted in a contract, the court noted that "in New York and across the country a binding contract can be formed despite 'material open issues'"); *Lambert Corp. v. Evans*, 575 F.2d 132, 137 (7th Cir.1978) (product line sales contract between U.C.C. merchants was enforceable in spite of numerous unagreed but inconsequential terms, with court remarking that "nothing in the law of contracts ... requires parties' minds to meet on all conceivably related questions"); *Restatement (Second) of Contracts* § 33, Comment a, at 92 (1981) ("[T]he actions of the parties may show conclusively that they have intended to conclude a binding agreement even though one or more terms are missing or are left to be agreed upon."). Accordingly, since reserving on the extra area price did not *per se* vitiate the contract's formation, further inquiry is warranted.

In *Metro-Goldwyn-Mayer, Inc. v. Scheider*, 75 Misc.2d 418, 347 N.Y.S.2d 753 (Sup.Ct.1972), *aff'd*, 40 N.Y.2d 1069, 392 N.Y.S.2d 252, 360 N.E.2d 930 (1976) (*per curiam*), an oral contract between a movie producer and an actor for a possible television series was created, notwithstanding the absence of an agreed filming start-up date. The Court approximated the date from the industry's custom and practice along with the parties' understandings.

> In reaching its decision, the Court stated: [W]here the parties have completed their negotiations of *what they regard as essential elements*, and performance has begun on the good faith understanding that agreement on unsettled matters will follow, the court will find and enforce a contract even though the parties expressly left those other elements for future negotiations and agreement, if some objective method of determination is available .... Such objective criteria may be found in the agreement itself, commercial practice or other usage and custom. If the contract can be rendered certain and complete, by reference to something certain, the court will fill the gaps.

347 N.Y.S.2d at 761 (emphasis added). *See also Lee v. Joseph E. Seagram & Sons, Inc.*, 552 F.2d 447, 453 (2d Cir.1977) (oral agreement to sell liquor distributorship was enforceable despite lack of a purchase price and other terms because "[b]etween th[e] industry standard and the reference to [a certain] transaction, there was extrinsic evidence to render the parties' obligations reasonably definite"); *United States v. Bedford Associates*, 657 F.2d 1300 (2d Cir.1981), *cert. denied*, 456 U.S. 914, 102 S.Ct. 1767, 72 L.Ed.2d 173 (1982) (failing to agree on lease square footage and overtime services rate did not prevent lease formation where administrative and commercial means respectively were available to resolve the disputes); *American Cyanamid Co. v. Elizabeth Arden Sales Corp.*, 331 F.Supp. 597 (S.D.N.Y.1971) (letter agreement for sale of business was not defeated by open terms such as closing date, accounting principles for verifying net worth, etc., where those terms could be ascertained).

In this case, after Camrex Reliance's October 30 acceptance, no telex immediately followed. Nor was one incumbent. Camrex Reliance and CCML had concluded negotiations over "what they regard[ed] as essential elements" (price, area, completion time, payment schedule, inclusions-exclusions, continuity), and work began four days later. *Metro-Goldwyn-Mayer, Inc. v. Scheider, supra*, 347 N.Y.S.2d at 261.

Had the parties considered the extra work price (or any other item) an essential term, hard bargaining would have continued. Instead, negotiations ceased and performance started. The contract had been struck. The unsettled term would be discussed in the near future—as explicitly stated in Camrex Reliance's acceptance and as implicitly assented to by CCML's work commencement.

Additionally, were it necessary, "extrinsic evidence" was available to render the new work price "reasonably definite." *Lee v. Joseph E. Seagram & Sons, Inc., supra*, 552 F.2d at 453. *See also United States v. Bedford Associates, supra*, 657 F.2d at 1311 ("[The parties] had frequently negotiated agreements concerning such 'extra' charges ..., and the court could have re-

viewed this prior course of dealing as well as standard practices in the industry, to set a reasonable rate.").

First, in the October telex exchange, the parties had agreed that the extra areas would be charged at a lower rate than the main contract areas, which were $1.46 and $1.47 per square foot. *Compare* PX 60 *with* PX 61. Camrex Reliance then balked at CCML's next proposal for $1.37. PX 63. Based on that exchange, the Court would have had a ceiling price, *i.e.*, the extra work would be *less* than $1.37 per square foot.

Second, for greater precision, the Court could have then summoned an expert to fix the industrial standard for comparable work. *See* Fed.R.Evid. 706; *Fugitt v. Jones,* 549 F.2d 1001, 1006 (5th Cir.1977) ("Rule 706(a) ... confers on a district court the discretionary power to appoint an expert witness on the court's own motion ...."). *Cf. Schrieffer's Motor Service, Inc. v. United Freight Forwarders, Inc.,* 210 F.Supp. 287, 291 (D.Minn.1962) (defense experts' testimonies on meaning of "receiving charge" in freight transportation industry was admissible to explain a technical contract term "capable of definite interpretation by experts") (footnote omitted).

In other words, if required, the Court may fill the contractual gap by utilizing the factual predicate in the record and by receiving expert testimony on industry price standards. The open term, therefore, was not deal-breaking. *See generally Lee v. Joseph E. Seagram & Sons, Inc., supra,* 552 F.2d at 453 ("Professor Corbin has observed that a court should be slow to deny enforcement 'if it is convinced that the parties ... meant to make a "contract" .... Many a gap in terms can be filled, and should be, with a result that is consistent with what the parties said and that is more just to both ... than ... refusal of enforcement.' ") (citation omitted).

### 3. *Modification*

If the October telexes constituted a contract, plaintiff argues that any agreement was repudiated by Arger's November efforts to force a contractual change. *See,*

*e.g.,* 17 *Am.Jur.2d* "Contracts" § 443, at 901 (1964) ("[T]he refusal of one party to perform an executory contract unless the other consents to a modification, as distinguished from a mere request for a modification amounts to a total breach ...."). *But see Restatement (Second) of Contracts* § 176, Comment e, at 485 (1981) ("A threat by a party ... not to perform his contractual duty is not, of itself, improper. Indeed, a modification induced by such a threat may be binding, even in the absence of consideration, if it is fair and equitable in view of unanticipated circumstances.").

Antliff testified that after remeasurement, Arger announced at a November 6, 1978 meeting that CCML could either accept $1,000,000 lump sum for the project or lease its men and equipment on a daily hire basis. From that, CCML apparently concludes that Camrex Reliance renounced the October contract, vesting CCML with the present right to rescind.

Assuming the accuracy of Antliff's testimony, plaintiff's right to rescind, if it existed, was lost.

> Continued insistence by one party ... upon performance by the other, even after default, may constitute a waiver of such default.... Where a breach of contract has been waived, there can be no rescission ....

22 *N.Y.Jur.2d* "Contracts" § 379, at 283 (1982) (footnotes omitted). *See, e.g., Schenectady Steel Co. v. Bruno Trimpoli General Construction Co.,* 43 A.D.2d 234, 350 N.Y.S.2d 920, 923 (1974), *aff'd,* 34 N.Y.2d 939, 359 N.Y.S.2d 560, 316 N.E.2d 875 (1974) (buyer's right to cancel due to untimely performance by steel seller waived but right to later sue for damages could have been retained). *See generally Ashland-Warren, Inc. v. Sanford,* 497 F.Supp. 374, 378 (N.D.Ala.1980) (partnership estopped from counterclaim recovery in breach of contract against paving subcontractor where parties had entered modified agreement for which breach settlement was partial consideration).

After Arger's announcement, Pagnam demanded by telex that the contract be

performed as previously agreed. But, when told by English counsel that the October telexes were not a contract, Pagnam reversed field and accepted the new agreement, thereby again pressing for Camrex Reliance's contractually bound performance—albeit under different terms. By that continuous insistence, Pagnam forfeited any present right to rescission.

The outcome, instead, was a modification.

> The modification of a contract results in the establishment of a new agreement between the parties which *pro tanto* supplants the affected provisions of the original agreement while leaving the balance of it intact. [Citations omitted.] Fundamental to ... a contract modification is proof of each element requisite to the formulation of a contract, including mutual assent ....

*Beacon Terminal Corp. v. Chemprene, Inc.*, 75 A.D.2d 350, 429 N.Y.S.2d 715, 717–18 (1980) (absence of intent and other requirements prevented a finding that lease had been modified to increase lessee's steam cost liability).

Simply recited, a contract's elements are "a bargain in which there is a manifestation of mutual assent ... and consideration." 17 *Am.Jur.2d* "Contracts" § 10, at 139 (Supp.1983). The bargain was the "agreement ... to exchange performances"—Camrex Reliance's $1,000,000 for CCML's grit blasting and coating. *Restatement (Second) of Contracts* § 3, at 13 (1981). The mutual assent was manifested in the November 10 interchange (CCML: "WE ACCEPT RELIANCE INC'S OFFER ...." PX 70. Camrex Reliance: "REFERENCE CONTRACT ... AND YOUR RECENT OFFER ..., WE ACCEPT." PX 71.).

■ Moreover, consideration under New York law was unnecessary since the modi-

fication was contained in signed writings (the telexes).

> An agreement ... to ... modify ... shall not be invalid because of the absence of consideration, provided that the agreement ... modifying ... such contract ... shall be in writing and signed by the party against whom it is sought to enforce the ... modification ....

N.Y.Gen.Oblig.Law § 5–1103 (McKinney 1978). *See Moore v. Scott Stamp & Coin Co.*, 178 F.2d 3, 5 (2d Cir.1949) (agreement to purchase stamps was modified in writing, making consideration needless); *Beacon Terminal Corp. v. Chemprene, Inc.*, *supra*, 429 N.Y.S.2d at 718 (absence of consideration or writing under N.Y.Gen.Oblig.Law § 5–1103, as well as other deficiencies, prevented modification increasing lessee's steam cost liability). In brief, the requisite elements were satisfied and, consequently, the October contract was modified.

#### 4. *Summary*

■ To recapitulate the foregoing analysis, the October 27–30, 1978 telexes did constitute a contract because, by their "expressions and conduct," CCML and Camrex Reliance objectively demonstrated that "they intended to reach a binding agreement." *Reprosystem, B.V. v. SCM Corp.*, *supra*, 522 F.Supp. at 1275. Further, those terms that "they regard[ed] as essential" were assented to, thereby rendering the agreement enforceable despite the open extra work term. *Metro-Goldwyn-Mayer, Inc. v. Scheider, supra*, 347 N.Y.S.2d at 761. Finally, the November 10, 1978 exchange modified the October agreement, while incorporating any consistent, previously agreed to items. *Beacon Terminal Corp. v. Chemprene, Inc., supra*, 429 N.Y.S.2d at 718.[11]

---

**11.** CCML's November 20 confirmation letter (PX 72) was not within the contract formation period and, therefore, its terms inconsistent with the earlier telexes do not reflect the bargain. In particular, "[l]ocal labor insurances" and heating were added to the exclusions list and, thus, *not necessarily* chargeable to Camrex

Reliance. Responsibility for those charges can be resolved during the recovery stage based on industry custom and practice and utilizing expert assistance, if required. *See Lee v. Joseph E. Seagram & Sons, Inc., supra*, 552 F.2d at 453; *Metro-Goldwyn-Mayer, Inc. v. Scheider, supra*, 347 N.Y.S.2d at 761.

One further point remains concerning the identity of the contracting parties. At trial, after CCML's case-in-chief, Arger conceded that based on the evidence, the former's contract was with Camrex Reliance. Tr. at 263. *See also* Arger DPF at 13. Based on its own evidentiary assessment, the Court finds and concludes that the contract was between Camrex Reliance and CCML. *See, e.g., Perlmuter Printing Co. v. Strome, Inc.*, 436 F.Supp. 409, 415 (N.D. Ohio 1976) (where officer of defendant first corporation acting with apparent authority attempted to contract for unknown, newly formed second corporation with same office and key personnel, the contract was enforceable against the first corporation, in part, "under the objective theory of mutual assent" because *plaintiff* intended to contract with the first corporation).

The foregoing finding (and concession) does not assure immunity from the consequences of fraudulent conduct if proven. In confining the present decision to the contract dispute, the Court is of opinion that the interests of the respective parties will be best served by an early determination of the amounts due for work, labor and services concededly performed and apparently accepted by the prime contractor, Coastal, so that payment of any sums found due may be expedited.

Accordingly, the respective parties shall confer with the Court in Chambers on February 9, 1984, at 4:00 P.M., to fix a date for further proceedings to that end. All other issues, including those involved in the related stockholders' derivative action, shall remain in abeyance.

SO ORDERED.